## Case No. 6,099.

### The HARRIET.

[1 Story, 251.][1]

Circuit Court, D. Maine. May Term, 1840.[2]

PENAL STATUTES — CONSTRUCTION — BOUNTY FOR FISHING VESSELS — WHEN IS VESSEL "AT SEA" — MEMORANDUM — FALSE CERTIFICATE — FRAUD — MISTAKE.

1. Although penal statutes are to be construed strictly, yet all the provisions thereof must be taken together, and interpreted according to the import of the words, and not by the mere division into sections, so as to give effect to the objects and intent of the statute. All statutes relating to the same subject matter, are to be interpreted together, and such a construction is to be given to them, consistent with the words, as will avoid the mischief, and promote the objects and policy contemplated by the statutes.

[Cited in The Bolina, Case No. 1,608; Bains v. The James and Catherine. Id. 756; Livingston v. Story, 11 Pet. (36 U. S.) 395; U. S. v. New Bedford Bridge, Case No. 15,-867; Harrison v. Vose, 9 How. (50 U. S.) 379; U. S. v. Wilson, Case No. 16,731; U. S. v. Marks. Id. 15,721; U. S. v. One Raft of Timber, 13 Fed. 799; U. S. v. Starn, 17 Fed. 437.]

[Cited in Tilton v. Tilton, 35 N. H. 432; Chicago & N. W. Ry. Co. v. City of Chicago, 148 Ill. 149, 35 N. E. 881.]

2. The 5th and 6th sections of the act of 1813, c. 34 [2 Story's Laws, 1352; 3 Stat. 51, c. 35] and the act of 1819, c. 212, [3 Story's Laws. 1742; 3 Stat. 520, c. 89], relating to the bounty upon all such vessels and boats, employed in the bank and other cod-fisheries, as shall be employed at sea for the term of four months, include within their terms all vessels engaged in the cod fisheries, without limitation or specification as to the length of their fares, or the nature of their fisheries.

[Cited in U. S. v. The Reindeer. Case No. 16,-145; U. S. v. The Paryntha Davis, Id. 16,-003.]

3. A vessel is "at sea," within the intent of the acts of 1813 and 1819, when she is without the limits of any port or harbours on the seacoast.

[Cited in The Helen Brown, 28 Fed. 112.]

4. In this case, an almanac was offered as evidence of the particular days on which the vessel (the Harriet) sailed and returned, wherein the letters R. and S. and dots were placed against particular days, as being the very days of her sailing and returning. It was held, that such a document was not a proper journal or memorandum book thereof entitled to credit, and that for this purpose an exact journal or memorandum of the actual days of her sailing and returning, should have been kept, in the nature of a logbook.

5. Where a vessel was enrolled and licensed for the fisheries, and without an oath having been taken by all the owners to the ownership, as prescribed by the statutes of 1813 and 1819,

and fraud and deceit were charged in procuring the bounty allowed by law to such vessels; it was held, that it must be satisfactorily proved, on the part of the United States, that the omission by the owners, who did not take the oath, was through fraud and deceit, and not through mistake, in order to render the vessel liable to forfeiture.

[Cited in U. S. v. The Reindeer, Case No. 16,-145.]

[Cited in Murray v. Joyce, 44 Me. 347.]

6. Where a certificate, made by the agent of the owner, of the particular times of sailing and returning of a vessel, engaged in the cod fisheries, was discovered to be incorrect and false after the bounty was received, it was held, that if the incorrectness and falsity were by mistake. there was no forfeiture under the acts of 1813 and 1819; but if by fraud and deceit, there was.

[Appeal from the district court of the United States for the district of Maine.]

Libel of seizure for an asserted forfeiture under the act of the 29th of July, 1813, c. 34 [2 Story's Laws, 1352; 3 Stat. 51, c. 35], giving a bounty to vessels licensed for, and engaged in, the cod fisheries. The libel charged, among other things, that the Harriet was in 1833 enrolled and licensed for the cod fisheries, and that during the existence of her enrollment and license, she was employed in a trade other than that, for which she was so licensed. It also charged, that the Harriet was, during the same year, enrolled and licensed for the cod fisheries, and that the owners of the said vessel did, by fraud and deceit, obtain the allowance provided for vessels employed in the fisheries, contrary to the act of 1813, c. 34 [c. 35]. The claim and answer denied the material allegations as to the forfeiture. At the hearing in the district court in September, 1836, a decree of forfeiture was pronounced [Case No. 6,100], and from that decree an appeal was taken by the claimants [Boynton and others] to the circuit court.

Mr. Howard, Dist. Atty., for the United States.

C. S. Daveis, for the claimants.

STORY, Circuit Justice. This cause has been very elaborately argued upon the present appeal, both as to the matters of law and matters of fact, arising in it. The only allegation in the libel, which seems now relied on, is that founded on the act of 1813, c. 34 [2 Story's Laws, 1352; 3 Stat. 51, c. 35]. The fifth section of that act, in substance, provides, that there shall be paid, on the last day of December, annually, to the owner of every vessel. or his agent, that shall be qualified, agreeably to law, to carry on the bank and other cod fisheries, and that shall actually have been employed therein at sea, for the term of four months, at the least, of the fishing season next preceding, which season is accounted to be from the last day of February to the last day of November, in every year, for each and every ton of the vessel's burthen, if of twenty tons and not exceeding thirty tons, two dollars and forty cents, and

---

[1] [Reported by William W. Story, Esq.]

[2] [Affirming Case No. 6,100.]

if above thirty tons, four dollars, three eighths of which shall belong to the fishing vessel, and the other five eighths shall be divided among the several fishermen, according to their proportions of the fish taken on board during the season. The sixth section, in substance, provides, that there shall be paid, at the like time, and in the like manner, to the owner of every fishing boat or vessel (the word "boat" not being used in the preceding section) of more than five tons or less than twenty tons, which shall have been actually employed at sea in the cod fishery for the like term of four months, and to his agent, the sum of one dollar and sixty cents upon every ton admeasurement of such boat or vessel; which allowance shall be accounted for as a part of the proceeds of the fares of such boat or vessel, and distributable accordingly, with a proviso, that such boat or vessel shall have landed in the course of the season, not less than twenty quintals of fish for every ton of her admeasurement; and that certain other regulations and proceedings (which are not necessary to be mentioned,) shall be observed and kept by the parties. Then comes the following clause, on which the forfeiture is now claimed; "And if, at any time within one year after payment of such allowance, it shall appear, that any fraud or deceit has been practised in obtaining the same, the boat or vessel, upon which such allowance shall have been paid, if found within the district aforesaid, shall be forfeited; otherwise the owner or owners, having practised such fraud or deceit, shall forfeit and pay one hundred dollars, to be sued for, recovered, and distributed," in the manner prescribed by the act of 1799, c. 128 [1 Story's Laws, 573; 1 Stat. 627, c. 22]. By another act passed in 1819 (Act March 3, 1819, c. 212 [3 Story's Laws, 1742; 3 Stat. 520, c. 89]), the allowance was increased; and it was thereby provided, that from the passage of that act there should be paid on the last day of December, annually, to the owner of "every fishing boat or vessel," or his agent, qualified agreeably to law to carry on the bank and other cod fisheries, and "that shall actually have been employed therein at sea for the term of four months at least of the fishing season next preceding, which season is accounted to be from the last day of February to the last day of November, in every year, for each and every ton of such boat's or vessel's burthen, according to her admeasurement as licensed or enrolled, if of more than five tons, and not exceeding thirty tons, three dollars and fifty cents; and if above thirty tons, four dollars," &c. &c.; with some other provisions not necessary to be mentioned. The second section of the same act provides; "That such parts of the fifth and sixth sections of the act hereby amended (the act of 1813, c. 34 [2 Story's Laws, 1352; 3 Stat. 51. c. 35]) as are contrary to the provisions of this act be and the same are hereby repealed." Now, the Harriet is of the burthen of twenty-four tons and 66/95

of a ton; and one of the questions, made at the present argument on behalf of the claimant, is, whether the forfeiture, provided for in the last clause in the sixth section of the act of 1813, c. 34 [3 Stat. 51, c. 35], in case the allowance is obtained by fraud and deceit, is applicable to any other boats or vessels than those, which are previously enumerated in the same section, to wit, boats or vessels of more than five tons and less than twenty tons; or whether it also applies to the description of vessels in the fifth section of the act, to wit, vessels of twenty tons and upwards.

The main stress of the argument on behalf of the claimant against applying the clause to any other vessels, than those described in the sixth section, is founded on the general consideration, that penal statutes are to be construed strictly; that cases within the same mischief are not to be deemed within any prohibition, unless the words clearly cover them; and that here the natural position of the clause connects it directly with the previous parts of the sixth section, as in pari materia; and that the language, "boat or vessel," are the very words of reference used in that section, whereas the word "vessel" only is used in the fifth section. That there is great weight in that suggestion need not be denied. Penal statutes are to be construed strictly; and cases within the like mischief are not to be drawn within a clause, imposing a prohibition or a forfeiture, unless the words clearly comprehend the case. These are known rules in the administration of justice, which I am not in the slightest degree inclined to question. That the juxtaposition of this clause with other clauses of the sixth section undoubtedly adds weight to the construction contended for, I freely admit. But in construing a statute we are to take into consideration all the provisions thereof; and to look to all the objects and the entire intent of the statute. It is to be interpreted as a whole; nay, the principle goes further, and all statutes on the same subject matter are to be interpreted together. If, then, a clause is found in one section, which, in its general language and import, is equally as applicable to other sections and provisions of the same act, as it is to the very section, in which it is found; if the main objects of those sections, and the true intent and policy of the act will be best promoted by reading it as applicable to all those sections; and if public mischiefs equally within the scope of the statute, would be thereby prevented, and upon a different construction those mischiefs would be left without redress; there certainly is very strong ground to say, that the clause ought to be so construed as to suppress the mischiefs, and not promote or protect them; that, as its language is appropriate, so it shall be construed as intended to include them. Where the public mischief is the same, and the words are sufficient to cover all the cases, it would be against all just rules of interpre-

tation to confine the language to one case only.

Now, in the present case, if the clause had stood by itself, as a seventh section of the act, without the alteration or addition of a single word, there could have been no ground for the argument now addressed to the court; for it would have been an irresistible inference, that "boat or vessel" applied to the "vessels" mentioned in the fifth section, as well as to the "boat or vessel" mentioned in the sixth section. If there was fraud or deceit in obtaining the allowance, (or bounty, as it is usually called) the forfeiture was equally necessary to secure the purposes of the statute,—to protect the honest owner, and to punish the dishonest owner. Now, what possible difference can it make in the construction of a statute, that there is a subdivision into sections? Suppose this act contained no such subdivision, might it not be read precisely in the same manner now, as it would then read, and be interpreted in the same way? Clearly it might; for statutes are construed by the import of the words, and not by the mere division into sections, or periods, or sentences. The intention of the legislatures does not break itself into sections. It is to be drawn from the entire corpus of the act, and not from single passages. But, in the present case, there is another most material consideration in aid of this interpretation, and that is, that the legislature have manifestly adopted it, or acted upon it in the amendatory act of 1819, c. 212 [3 Stat. 520, c. 89]. The first section of that act (already cited in its substance) merges the fifth and sixth sections into one, so far as the allowance or bounty is concerned, and apportions it by the same rule,—the tonnage of the "boat or vessel," and upon the same condition,—the employment at sea for a specific period. It also repeals all such parts of the fifth and sixth sections, which are inconsistent with its own provisions. Henceforth, then, we must read both acts together, as constituting one entire act, striking out the parts repealed, precisely in the same way and manner, and with the same effect, as if the act of 1819, c. 212 [3 Stat. 520, c. 89], had re-enacted in one act all the provisions of the act of 1813, c. 34 [3 Stat. 51, c. 35], except those, which were repealed. Of course, this would leave the clause of the sixth section of the act of 1813, imposing the forfeiture or penalty, in full force; and, therefore, as the language of the new act, as well as this clause, both included the same descriptive words, "boats and vessels," boats and vessels, whether below twenty tons burthen, or above it, would be equally within the reach of the forfeiture and penalty so prescribed. This view of the matter, in my judgment, puts an end to the controversy on this point.

The next question, which has been argued, is, as to the true meaning of the clause, requiring the boats and vessels to be employed "at sea" for the prescribed term. On behalf of the United States a doubt has been suggested by the district attorney, whether boats and vessels employed in the shore fisheries, that is, making short voyages, or fares, or trips, in the fisheries on our immediate coasts, and returning into port within a few days, so that they may be out by day and in port by night, are within the purview of these acts. I profess not to feel the soundness of this doubt. It is plain to me, that the very small tonnage of some of these "boats and vessels," varying from five tons to thirty tons, as well as the known habits and usages of the trade, exhibit on the part of congress an intention to encourage all cod fisheries of this sort, whether on the great and distant banks, or on the coasts of the sea nearer home. The act of 1813, c. 34 [3 Stat. 51, c. 35], speaks explicitly of "the bank and other cod fisheries." Now, the bank fisheries are, in common parlance, always spoken of, as contradistinguished from the shore or coast fisheries. Neither the act of 1813, nor that of 1819, speaks of boats or vessels, which are to be at sea during the whole period of four months continuously, without any intermediate return into port; and if they did, the act would apply to very few, if any, of our vessels engaged in the cod fisheries. It would be most extraordinary, if, when congress provided a bounty to boats and vessels, varying so much in their tonnage as from five tons to thirty tons, and hardly capable of keeping the sea but for short and favorable periods, and which the very terms of the act contemplate would make, not a fare, but "fares," that is, distinct voyages out and home during the four months, I say, it would be most extraordinary, if the very return into port within the period should defeat the bounty. If the boat or vessel be at liberty to return at all, there is in neither act any limitation, as to the frequency of the returns, whether by day or by night, any more than there is as to the "fares" made by her during the season. The seventh section of the act of 1813, c. 34 [3 Stat. 51, c. 35], requires, that the owner of a fishing vessel of twenty tons and upwards, or his agents, shall, previous to receiving the allowance or bounty, produce to the collector a certificate signed by him, therein mentioning the particular days, on which the vessel sailed and returned on the several voyages or fares, she may have made during the preceding fishing season, to the truth of which he shall swear, or affirm. But it no where limits the times or the periods of sailing or of returning. Besides; it is well known, that boats and vessels of this class ordinarily fill up their whole capacity and burthen in a few days, or weeks; and the very object of the acts, in encouraging the fisheries, would be defeated, if they could not, after they were full, return and land their cargo, and go again to sea in quest of more. But it is sufficient for me, that the acts speak a plain and intelligible language

on this subject, applying it to "all boats and vessels," employed at sea during the four months, without any other qualification or limitation, as to the length of their fares, or the nature of their fisheries, whether on the banks, or on the coasts.

Then, as to the other point. What is the true meaning of being "at sea," in the sense of these acts? What is the sea? We all know, that the sea embraces all tide waters on the coast of our country, and the bays thereof. When once any boat or vessel is out of the limits of our ports, or harbours, extra fauces terrae, vel portus, the boat or vessel is in a legal, as well as in a nautical sense, at sea. Mr. Justice Blackstone, in his Commentaries, states this doctrine in a very clear manner. "The main sea (says he) begins at the low-water mark. But between the high-water mark and the low-water mark, where the sea ebbs and flows, the common law and the admiralty have divisum imperium, an alternate jurisdiction: one upon the water, when it is full sea; the other upon the land, when it is an ebb." See 1 Bl. Comm. 110. The same doctrine is stated in Constable's Case, 5 Coke, 106. Lord Hale treats the same subject in his tract. De Jure Maris, and says: "The sea is either that, which lies within the body of a country, or without. That arm or branch of a sea, which lies within the fauces terrae, where a man may reasonably discern between shore and shore, is, or at least may be, within the body of a country. The part of the sea, which lies not within the body of a country, is called the main sea or ocean." Hale's De Jure Maris, etc., Harg. Law Tracts, p. 10. The same doctrine has been repeatedly recognized in the circuit courts, and in the supreme court of the United States. See U. S. v. Furlong, 5 Wheat. [18 U. S.] 184; U. S. v. Wiltberger, Id. 99; The Abby [Case No. 14]; U. S. v. Grush [Id. 15,268]; U. S. v. Coombs, 12 Pet. [37 U. S.] 72. Now, applying this doctrine to the present case, I should say, that the Harriet was at sea, employed in the cod fisheries, the moment that she sailed on her outward voyage, and she had got out of port, or beyond the limits of the port, or harbour, extra fauces terrae, and that she was not at sea, from the moment, that on her return voyage she came within the limits of the port, or harbour, intra fauces terrae. I know of no principle applicable to cases of this sort, by which any allowance can be made for any time, while the vessel is in port, either on the outward or the homeward voyage or fare. Neither do I know of any mode, acknowledged by law, of apportioning the time, half to each part of the voyage or fare; that is, to deem half of the day on the outward voyage to be at sea; and half of the day, on the return voyage, in port. It is to the actual facts, that the law looks, and not to any average or apportionment, not established by these facts. The true duty of the owner and skipper of these boats and ves-

sels is, to keep an exact journal or memorandum of the actual times of being at sea, whether whole days, or parts of days; and thus to enable the collector, or other officers of the customs, to ascertain with entire exactness the true time passed at sea. The mere marking, or mere dotting of an almanac, which might be exchanged or altered at pleasure, would be, and could be no just or sufficient proof of the verity of the marks or dots therein, as expressing the true times. If any document of this sort is to have weight, as an original journal or memorandum, to repel suspicion or to establish verity, it must be some document, which in its nature or character, like a log-book kept at sea, should contain original entries made from day to day, and be beyond question a document not made up for a particular purpose afterwards, upon general recollections and suggestions of the parties in interest. What I desire to say is, that, for the reasons already suggested, the almanac, now produced as a memorandum of the times of the sailing, and of the return of the Harriet on her several voyages or fares, is not a satisfactory document to relieve the case from any otherwise well-founded suspicions of bad faith, or fraud or deceit. It may, or may not, be correct. But it carries no persuasive proof per se under the circumstances of the present case, to satisfy doubts or to control presumptions arising from other portions of the evidence.

Some other objections have been taken in the present case, by the district attorney, which it may be well to dispose of in this place. First, it is said, that the Harriet was not duly qualified, as a vessel licensed for the fisheries, to obtain the allowance or bounty, because all the owners did not take the oath of ownership, required by law to be taken on such enrolment, within ninety days from the granting of the enrolment. The act of the 18th of February, 1793, c. 52, § 1 [1 Story's Laws, 285; 1 Stat. 305, c. 8], provides, that ships or vessels of twenty tons and upwards, which shall be enrolled and having a license in force, shall be deemed vessels of the United States, entitled to the privileges of ships or vessels employed in the coasting trade or fisheries. The second section of the same act provides, "that in order for the enrolment of any ship or vessel, she shall possess the same qualifications, and the same requisites in all respects shall be complied with, as are made necessary for registering ships and vessels by the act," &c. for the registering and recording of ships and vessels. Act 1792, c. 45 [1 Story's Laws, 269; 1 Stat. 231, c. 6]. Now, this last act requires (section 4) that in order to a registry, an oath or affirmation shall be taken by one or more of the owners, of the ownership, built, &c. of the ship or vessel; and the fifth section provides, that it shall be the duty of every owner, resident within the United States, of any ship or vessel to which a certificate of registry has been granted, to trans-

mit to the collector a like oath or affirmation with that taken by the owner, on whose application the register was granted, within ninety days after the same was so granted; 'and if such oath or affirmation be not taken and transmitted as required, the certificate of registry granted to such ship or vessel shall be forfeit or void. Now, the argument is, that the same provisions are applicable, and the same forfeiture incurred, by the omission of the other owners of the Harriet to take the required oath or affirmation within ninety days after her enrolment. The Harriet was enrolled on the 16th of April, 1831, and received a license on the 10th of April, 1833. Assuming this objection to be well founded in point of law, (on which I give no opinion,) what then is the predicament of the Harriet, according to the argument? It is, that she was not a vessel licensed for the fisheries during the season, but her enrolment and license were forfeited; and she was in no respect entitled to the bounty. In other words, she was not, within the words of the acts of 1813 and 1819, a vessel "qualified agreeably to law for carrying on the bank and other cod fisheries." But how, then, does the forfeiting clause of the act of 1813 apply to her? It is clear, that it applies only to vessels "qualified agreeably to law" to carry on those fisheries; which, under these circumstances, according to the argument, was not the case of the Harriet. Besides; the forfeiture attaches to the procuring of the allowance or bounty by any fraud or deceit, practised in obtaining the same. How can this be affirmed in the case of the Harriet, as to the owners, who omitted to take the proper oath or affirmation? That was either a mistake, or an omission on their part, and not naturally or necessarily a fraud or deceit. The omission could not amount to a fraud or deceit practised upon the collector; for from the papers in his own office, he knew, or ought to have known, that there had been such an omission or mistake by some of the owners. It may be added, that if this omission be set up as a fraud or deceit, it should be proved to have been so intended; of which there is not a shadow of proof. There can be no doubt, that, in the understanding of the parties, the Harriet was "qualified agreeably to law," in the sense of the acts of 1813 and 1819, to carry on the fisheries; that is, she was enrolled and licensed for the fisheries; and even if the enrolment had become void, and forfeited by the omission, within ninety days, it having been granted in 1831; yet the license granted to her by the collector, in April, 1833, was manifestly supposed by the collector, as well as the owners, to be a good one, under the enrolment, and in no just sense could the obtaining of the license be treated as a fraud or deceit practised upon the collector. Suppose the Harriet had been fairly and truly employed for the full term of four months at sea, during the fishing season of 1833, and had received the allowance or bounty for that year, upon the mutual mistake of all the parties, that she was duly enrolled and licensed, could there be any ground to enforce the forfeiture now insisted on in the present proceeding. But this objection does not in fact arise in the present case. The very libel founds the forfeiture upon the allegation, that the Harriet "was a vessel of the United States, duly enrolled and licensed to be employed in carrying on the bank and other cod fisheries, and being so enrolled and licensed, the owners of said boat did then and there, by practising fraud and deceit, obtain the allowance by law provided for vessels employed in the fisheries, passed &c., contrary to the form of the statute in such case made and provided; whereby the said vessel, her tackle, &c. became forfeited to the United States." Now, this allegation admits the vessel to have been duly enrolled and licensed, and in her character, as a vessel so enrolled and licensed, to have received the allowance. The United States are, therefore, estopped to deny the very foundation, on which the forfeiture is made to rest. In every view of the matter, then, this objection may be dismissed.

Another objection is, that the Harriet was not, in point of fact, employed during the season in the cod fisheries; but was, in fact, employed in the hake fishery. It is said by the district attorney, that the hake fishery is distinct from the cod fisheries, the hake fishery being carried on exclusively in the night. But it by no means follows, that if it be the common usage and custom for vessels employed in the cod fisheries to engage in the hake fishery during the night, as an incident to their principal employment, that the employment is not truly such, as the acts of congress contemplate. We all know, that it is a common usage and incident to the cod fisheries, to fish for and to catch pollock, halibut, haddock, and other fish; and it has never been imagined, that this was not within the scope of the license. Until the mackerel fishery was, by the act of congress, separated into a distinct employment, it was frequently carried on in connexion with, and as an incident to the cod fisheries. No one can now doubt, that mackerel may be still caught in the cod fisheries, if it be not so pursued, as to supersede the principal employment, but is a mere accessory or incidental fishery. This was the doctrine fully recognized by the learned district judge, and afterwards on appeal in this court, in the case of The Nymph [Cases Nos. 10,388 and 10,389]. Upon that occasion, the district judge said: "All the bank and coast fisheries have been carried on under the authority of this license. Pollock, hake, and other fish, which are cured and dried in the same manner as cod; and no doubt has been raised as to the legality of the employment." There is no evidence in this case, which, properly considered, establishes the fact, that the Harriet was exclusively employed in the hake fishery, in contradistinction to the cod fisheries, during the season. Before I should

be prepared to adopt such a conclusion. I should require the most determinate and satisfactory evidence, that the hake fishery was intentionally and exclusively carried on, during the season, as the principal employment of the Harriet in contradistinction to the cod fisheries.

We are driven, then, to the consideration of the mere matter of fact, whether the allowance or bounty of the Harriet was in fact procured by fraud and deceit. The act of 1813, c. 34 [3 Stat. 51, c. 35], in the seventh section, requires, that the owner or owners of every vessel of twenty tons and upwards, or his or their agent or representative, shall, previous to receiving the allowance made by the act, produce to the collector the original agreement or agreements made with the fishermen employed on board the vessel, and also a certificate, to be by him or them subscribed thereon, mentioning the particular days, on which the vessel sailed and returned, on the several voyages or fares she may have made in the preceding fishing season, to the truth of which he or they shall swear or affirm before the collector. A certificate, purporting to be such as is thus required, was actually subscribed and sworn to before the collector, by Leander Miller, on the first day of January, 1834; and on this certificate the allowance was paid. The certificate states the particular times of the sailing and return of the Harriet on her different fares, (in all nineteen fares,) amounting, inclusive of the days of her sailing and her return, to one hundred and thirty-one days, between the 7th of May, 1833, and the 29th of October, 1833. There is, however, an error in the calculation, apparent on the face of the paper, of ten days, which being deducted, leaves the whole period to be one hundred and twenty-one days only, including the days of sailing and return. It is manifest, therefore, that the Harriet was not, on the very face of the paper, entitled to the allowance, for she was not employed at sea, according to this certificate, four months during the fishing season of 1833. Even supposing, that we were absolutely to look to mere averages of time, which, in my judgment, however common the practice may be, is an incorrect mode of fixing it, for the act requires the vessel to be actually, and not merely presumptively or constructively at sea, for four full months; still, averaging the times of sailing and returning to enable the Harriet to be at sea half the day, and half the day in port, there are but one hundred and twelve days at most, which can be asserted to be her days at sea. This circumstance alone would certainly not be decisive to establish fraud or deceit in the owner or his agent; for it might be by a pure mistake, in which case, although the allowance was wrongfully paid and wrongfully received, yet it was not necessarily or naturally a cause of forfeiture within the act. If, on the other hand, the certificate was knowingly and

designedly thus drawn with intent to deceive the collector, trusting to his not detecting the errors in the calculation, then undoubtedly it would be evidence of fraud and deceit. But in point of fact the certificate was false, and was shown to the agent to be false at the time, when it was sworn to. It is now admitted, and indeed, is established beyond controversy, that the particular times stated in the certificate of the sailing and the return of the Harriet were not the true times; but they were put into the certificate by George Miller (an inspector of the customs) with the assent of the agent, to make up the supposed period of four months required by the act, without the slightest regard to the real periods of the Harriet's sailing and return; and thus the collector was imposed upon as to the true and real state of the facts. This fact is, under such circumstances, prima facie evidence of fraud and deceit in the owner or his agent. In order to repel this imputation, George Miller was introduced by the claimant as a witness in the court below, to show the manner and circumstances, under which the certificate was made; and his testimony directly and fully established, that the certificate was made up in the manner above stated; but he denies, that it was done or intended to be done fraudulently or deceitfully. He professes to say, that he deemed it immaterial to state the actual times of the sailing and return of the Harriet, so only, that the four months' employment at sea were actually made out. This is, indeed, most extraordinary conduct on the part of a public officer, in direct contravention of the very language and purport and object of the seventh section of the act of 1813. A good deal of stress has been laid in the argument upon the question, whether, upon the present appeal, George Miller ought to be deemed the witness of the government or of the claimant. I think, that he is to be deemed the witness of the claimant, as he was in the court below. The government have not here adopted or used him as a witness; and unless so expressly adopted and used, he must be treated, as here introduced, as he was in the court below, as a substantial witness for the claimant. To fortify his testimony, evidence is now adduced in the cause to show, that the Harriet was in fact employed in the cod fisheries in the same year, during nearly the whole of the month of November, so as to make up the whole period of four months. An almanac is now also produced by the United States purporting to be the almanac in which the original days of the sailing and return of the Harriet, partly in pencil marks of R. (Return) and S. (Sailing) and dots in ink, against certain days in the almanac, as being the very days of (S.) Sailing, and of Return (R.). Now, I have already had occasion to state, that such a mode of keeping an account of the times of the fares, is not in any just sense a journal; and, as a record or document, it is so easily capable of being

fabricated at any moment, for the purpose of relieving the cause from its distress, that no court of justice, mindful of its own duty, could give it entire credit as a veritable paper. It has very much the air of an afterthought; and it purports to give, in the month of November, a single continuous fare or voyage of fourteen days. November, as we all know, is ordinarily one of our months of uncertain and boisterous weather; and there is evidence in the case, which establishes, that, in that very season, there was at least the usual quantity of such weather, in some of which it might be difficult for the Harriet to keep the sea on our coast without imminent danger of loss or injury. But I do not rely on this circumstance. There is much evidence in the case, on both sides, which might justify comments, if it would assist my own judgment in the final conclusion. After weighing the whole of the evidence, I am entirely satisfied, that the decree of condemnation ought to be affirmed. I proceed upon the admitted ground, that the certificate, as sworn to, was knowingly false; and being so, there was fraud and deceit practised in obtaining the allowance provided by the act. It necessarily misled the collector, and lulled his vigilance. If a man will knowingly swear to a false statement, it is no apology, that he deemed it just as well, as if it contained the truth, because the truth might equally have availed to him for the purpose. The deliberate statement of a falsehood to a public officer, to obtain the allowance, is a fraud and a deceit. Upon such certificate the party may obtain only, what the truth might have entitled him to receive. Still he does receive it by a deceit practised upon the officer; and it has the odious features both of an allegatio falsi, and a suppressio veri. Neither has any claimant a just right to complain, that the court does not place implicit confidence in his subsequent explanations, when he has already shown himself ready to practice, or to countenance, deceit upon public officers. It is but a wholesome administration of public justice, to hold the party bound by the statement, which he has deliberately adopted and solemnly sworn to, as the truth.

The decree of the district court is affirmed with costs.