STONE *v.* UNITED STATES (No. 516). KRAEMER *v.* UNITED STATES ·(No. 527).[1]

1. "SADDLERY."

In view of the construction by the administrative departments, by the board, and by the courts, and in the absence of clear proof of a commercial designation, the word "saddlery" occurring in paragraphs 450 and 461, tariff act of 1909, can not be taken to apply to articles used in the care of horses or for horse-stable equipment.

2. CURRYCOMBS, HOOF PICKS, HORSE CLIPPERS, WHIP THONGS, AND THE LIKE.

Currycombs, hoof picks, horse clippers, whip thongs, and the like are not "saddlery," and these are dutiable according to the component of chief value as manufactures of metal or the manufactures of leather.

3. TIME PROVISO·IN PARAGRAPH 450, TARIFF ACT OF 1909.

The qualifying words of one clause of a section may be extended to other clauses or even other sections of a law, if to give effect to the apparent intent of the legislature this is necessary; and the proviso in paragraph 450, tariff act of 1909, that on and after October 1 of that year certain described leather goods should bear a prescribed rate of duty, will be taken to apply to all the articles enumerated in the several clauses of that proviso and to similar articles also designated in paragraph 461 of the act.

United States Court of Customs Appeals, May 8, 1911.

APPEAL from Board of United States General·Appraisers, Abstract 24331 (T. D. 31134).

[Affirmed.]

*Brown & Gerry* for appellants.

*D. Frank Lloyd,* Assistant Attorney General (*Charles E. McNabb* on the brief), for the United States. .

Before MONTGOMERY, SMITH, BARBER, DE VRIES, and MARTIN, Judges.

MONTGOMERY, Presiding Judge, delivered the opinion of the court:

The importations the subjects of controversy in these two cases are, as to the first-entitled cause, currycombs, hoof picks, rack chains with two snaps, a swivel, and a ring, horse clippers, and parts of horse clippers. As to the second-entitled cause, whip thongs, lip straps, bridle fronts, pony bridles, and leather-covered buckles.

The above-described importations of Stone & Co. and Bartley Bros. & Hall, which were the subject of protest in the first-entitled cause were classified as "manufactures of metal and manufactures of leather, and dutiable, respectively, at the rate of 45 per cent under paragraph 199 of the tariff act of 1909 and at the rate of 40 per cent under paragraph 452.

The importation of whip thongs protested in the second entitled cause was classified as manufactures of leather, dutiable at the rate of 40 per cent under paragraph 452. A further question raised in the second above-entitled cause will be dealt with later.

---

[1] Reported in T. D.·31593 (20 Treas. Dec., 1010).

The principal question presented in the two cases is whether the word "saddlery" is broad enough, either in its ordinary signification or by any extended use established by evidence of commercial designation, to include such articles as currycombs, hoof picks, horse clippers, rack chains, and whip thongs, the articles involved in this importation.

Turning to the lexicographers we find the word "saddlery" defined by the Standard Dictionary as "saddles and whatever belongs to them collectively; all leather articles and their fittings used about horse furniture." The Century Dictionary defines "saddlery" as "saddles and their appurtenances in general; hence by extension, all articles concerned with the *equipment* of horses and especially those made of leather, with their necessary metal fittings." In Worcester the term "saddlery" is defined as "saddles and other articles of horse *gear* made by a saddler."

It is clear that such articles as are used in the care of horses and as stable equipment do not fall within these definitions. The definition is not broad enough to include everything that may be used in the care of a horse. For instance, in Veil *v.* United States (113 Fed. Rep., 856), it was said by Coxe, district judge:

I do not think it can be contended that "saddlery" is limited to articles of leather, because it appears that there is a saddle cloth and I suppose the court may take judicial notice that the surcingle is made of canvas. On the other hand, I think the word "saddlery" should not be expanded to apply to these articles in suit, which belong more properly to the veterinary department. "Saddlery," whatever else it may or may not mean, ought to be applied to the trappings of a well horse, a "going" horse, and not a sick one.

See also McCoy *v.* Hedden (38 Fed. Rep., 89, and T. D. 21713), which contains a definition of the word "saddlery" quite in harmony with that given by the lexicographers, which we think is fairly comprehensive:

The term "saddlery" would seem to embrace most, if not all, articles used in the equipment of horses. It might be defined as the apparel of a horse, and would include halter, bridle, saddle, girth, crupper, etc., just as the apparel of a person would include hat, shirt, suspenders, trousers, shoes, etc., * * *."

It appears also that administrative construction is in accord with this definition. For instance, "horse shears" were classified under the provisions of "cutlery of all kinds" (T. D. 3195), while on the other hand "saddle girths" have been held dutiable as saddlery, because "essential parts of saddles and intended exclusively for use as such." (T. D. 5776.) And the practice of customhouses, as shown by customs examiners, has been to return for duty articles that are used in parts of harness or as saddles as saddlery; also, saddle girths and rollers as saddlery, but currycombs, hoof picks, manger locks, and clippers have been returned according to the component

material of chief value; and articles which are used in the care of a horse, as distinguished from the equipment of a horse, have not been classified as saddlery.

In view of this construction by the administrative department and by the board and the courts, it is to be presumed, in the absence of very clear proof of a commercial designation, that the word "saddlery" was used in its ordinary signification by Congress in the enactment of the present statute.   This is manifest by the comprehensive language used in the words "harness, saddles, and saddlery."   Under the rule of *ejusdem generis* the inference is strong that there was intended to be included in this classification articles which were the gear or equipment of a horse.

The question is raised as to whether a commercial designation should prevail over such evidence of legislative intent as is afforded by this history of previous legislation and the construction thereof. Upon this subject see Roosevelt v. Maxwell (20 Fed. Cas., 1155).

But we deem it unnecessary at this time to determine this question. We are convinced that there has been shown no such clear, uniform, and precise use of the term "saddlery" in the wholesale trade as to justify us in discarding the ordinary definition of the word and adopt one so comprehensive as to include articles which have never been heretofore known in common parlance under that name.

The attempt to show this commercial usage was by three witnesses who are engaged in the business of selling goods.   One witness testified, in answer to the question—

Q. Is the term saddlery one that is generally recognized in your trade?—A. Yes, sir.

Q. What variation, if any, have you found in the meaning of the word as used by you?—A. Simply goods for the use and care of horses.   Some use the words "horse goods," but the term generally known is "saddlery goods."

  *    *    *    *    *    *    *

Q. Do you as a salesman actually make use of the word "saddlery?"—A. Why, oftentimes; yes, sir.

Q. And you hold yourself out as a dealer in saddlery?—A. Yes, sir.   In the trade that is a recognized term, a word that is used—saddlery and horse goods.   Sometimes we say "saddlery and horse goods," and sometimes use the word "saddlery."

It is evident that this language is used rather with the purpose of defining the vocation of the salesman than as any attempt to define technically the character of the goods which he is offering for sale. It is well known that salesmen of drugs oftentimes sell in connection such articles as cigars and cigarettes, yet they would ordinarily speak of themselves as drug salesmen, and of their business as druggists. It would hardly do to say that this would show conclusively that cigars or cigarettes are drugs.   The testimony of the other witnesses is of similar character, and we agree with the Board of General Appraisers that it is not persuasive to show that the term saddlery is synonymous with horse goods.

The question is not wholly dissimilar to that of Davies *et al. v.* United States (107 Fed. Rep., 266), in which case it was claimed that carriage whips were dutiable as saddlery and the evidence showed that they were sold in saddlery shops. If the testimony of the importer's witnesses is analyzed, it will be seen that this is substantially the only reason for saying that these importations are saddlery. They are carried in the stock of saddlers, and there is nothing to indicate that they are not also carried by hardware men. This would not make them saddlery in one case and hardware in the other. The board did not err in its ruling on this branch of the case.

The other question presented in the brief of counsel as to the second case is that dependent upon the construction of the proviso to paragraph 450. The pertinent provisions of the statute are as follows:

PAR. 450. Hides of cattle, raw or uncured, whether dry, salted, or pickled, shall be admitted free of duty: *Provided*, That on and after October first, nineteen hundred and nine, grain, buff, and split leather shall pay a duty of seven and one-half per centum ad valorem; that all boots and shoes made wholly or in chief value of leather made from cattle hides and cattle skins of whatever weight, of cattle of the bovine species, including calfskins, shall pay a duty of ten per centum ad valorem; that harness, saddles and saddlery, in sets or in parts, finished or unfinished, composed wholly or in chief value of leather, shall pay a duty of twenty per centum ad valorem.

PAR. 461. Harness, saddles, saddlery, in sets or in parts, finished or unfinished, thirty-five per centum ad valorem.

The importer contends that the provisos to paragraph 460 as to time is to be restricted to the first clause of the proviso. If this construction be placed upon the language, it renders paragraph 461, which fixes a duty of 35 per cent ad valorem on harness, saddles, saddlery, accessories and parts, finished or unfinished, inharmonious, as its language clearly includes many articles which would by protestant's construction fall under the leather paragraph. According to the construction of the importer, this same provision in paragraph 450 that harness, saddles, saddlery, accessories and parts, finished or unfinished, composed wholly or in chief value of leather, shall pay a duty of 20 per cent ad valorem, places a restriction upon harness, saddles, and saddlery composed wholly or in chief value of leather. This classification would include almost all property which would otherwise fall under paragraph 461. But aside from this we think the language is perfectly plain. In the absence of language speaking to the future in the various paragraphs of section 1 the bare statement of the rate of duty is all that occurs, and it relates back to the first part of the section where it is declared—

That on and after the day following the passage of this act, except as otherwise specially provided for in the second section of this act, there shall be levied, collected, and paid upon all articles when imported from any foreign country into the United States or into any of its possessions * * * the rates of duty which are by the schedules and paragraphs of the dutiable list of this section prescribed, namely:

In paragraph 450 the proviso is intended to take effect in the future. It is provided that on and after October 1, "seven and one-half. per centum ad valorem;" and following further is the proviso that "harness, saddles, saddlery in sets or in parts, finished or unfinished, composed wholly or in chief value of leather, *shall* pay a duty of twenty per centum ad valorem." These words "shall pay a duty of" were obviously introduced for the purpose of making the enactment speak as of a future date and relate back to the words "on and · after October 1, 1909."

It is hardly necessary to cite authority to support what seems to us a very obvious construction of this statute, but the authorities cited in the brief of counsel for Government are ample to justify the statement that the court will look to the entire clause or section and will apply the words as the evident intent of the legislature is manifested and that qualifying words of one clause of a section may be extended to other clauses or even to other sections if such be the apparent intent of the legislative body. Endlich on Interpretation of Statutes (secs. 404, 414); Lewis's Sutherland Stat. Cons. (secs. 409, 420, 421). The language of the court in *The Harriet* (11 Fed. Cas., 588), opinion by Mr. Justice Story, is peculiarly appropriate:

If, then, a clause is found in one section which, in its general language and import, is equally as applicable to other sections and provisions of the same act as it is to the very section in which it is found; if the main objects of those sections and the true intent and policy of the act will be best promoted by reading it as applicable to all those sections; and if public mischiefs equally within the scope of the statute would be thereby prevented, and upon a different construction those mischiefs would be left without redress, there certainly is very strong ground to say that the clause ought to be so construed as to suppress the mischiefs and not promote or protect them; that, as its language is appropriate, so it shall be construed as intended to include them.

The purpose of this proviso is not difficult to see. Section 450 had · the purpose of admitting hides of cattle free of duty, and also of reducing the tariff rate on leather and manufactures thereof. But in view of the fact that the importations of manufactures of leather would, if admitted at the reduced rate, at once, upon taking effect of the statute, bring such importations in competition with importations already made or with domestic manufactures which had been produced at a time when the tariff rate was much higher, it was thought best to give to the manufacturer the opportunity to market his goods before this substantial reduction should be effective. Obviously this consideration applied as well to the manufactures of leather, such as those under consideration in this case, as to any others named in the proviso.

We think the Board of General Appraisers did not err upon this branch of the case. It follows that the decision of the board in each of these cases is *affirmed.*