WATSON, GEACH & CO. (INC.) *v.* YORK METAL & ALLOYS CO. (AMERICAN MANUFACTURER), UNITED STATES APPEARING (No. 2636)[1]

1. COMMERCIAL DESIGNATION—BURDEN AND MEASURE OF PROOF—WITNESS'S QUALIFICATION—"STEEL SCRAP"—"TUNGSTEN STEEL SCRAP"—"HIGH-SPEED STEEL SCRAP"—"HIGH-SPEED STEEL TURNINGS."

Commercial designation is a question of fact and the burden of proving it by a fair preponderance of evidence rests upon him who asserts it. A metallurgist who has "charge of incoming raw materials and specifications for outgoing materials," who has never bought or sold ordinary carbon scrap steel or tungsten scrap steel, or has not otherwise learned of trade designation from actual experience in wholesale commercial transactions, but depends upon his technical experience in the manufacture of steel and upon general conversations and hearsay statements for information upon the subject, is not qualified to testify as to whether or not merchandise known as "tungsten steel scrap," "high-speed steel scrap," and "high-speed steel turnings" is commercially within the provision of paragraph 301, Tariff Act of 1922, for "scrap steel." Proof that the merchandise is thus variously known shows only that it is a particular class of steel scrap and not that it is not steel scrap. With one qualified witness testifying for the commercial designation and several against it, the finding of the court below, on this record, for it is against the weight of the evidence.

2. CONSTRUCTION, PARAGRAPHS 306 AND 301, TARIFF ACT OF 1922—"STEEL"—"SCRAP STEEL"—ABSURDITY TO BE AVOIDED—AIDED BY CONTEXT.

The definition of "steel" contained in paragraph 306, Tariff Act of 1922, embraces not only carbon steel, but alloy steel also. Consequently tungsten steel scrap is not without the provision of paragraph 301 for scrap steel. To define steel as containing only iron and carbon would, in view of the fact that the content of commercial steel is never so limited, result in leaving practically nothing dutiable under the 41 paragraphs of the metal schedule (307–400) providing for articles made wholly or partly of steel, or under the provision of paragraph 301 for scrap steel.

3. TUNGSTEN SCRAP STEEL—"ALLOYS NOT SPECIALLY PROVIDED FOR USED AS SUBSTITUTES FOR STEEL IN THE MANUFACTURE OF TOOLS"—ABSURDITY TO BE AVOIDED.

Since tungsten steel is *steel*, its scrap can not, because it may be used in the manufacture of tools, be classified under paragraph 304, Tariff Act of 1922, as a *substitute* for steel so used.

---

[1] T. D. 42112.

4. TUNGSTEN STEEL SCRAP—METALLIC TUNGSTEN.

With proof that metallic tungsten contains 96 per centum of tungsten, tungsten steel scrap containing only about 14 per centum can not be classified as such under ᴘaragraph 302, Tariff Act of 1922.

5. "ALLOYS OF TUNGSTEN"—"ALLOYS USED IN THE MANUFACTURE OF STEEL"—"COMPOUNDS OF TUNGSTEN"—TUNGSTEN STEEL SCRAP—RELATIVE SPECIFICITY—USE.

While, generally speaking, a waste resulting from the manufacture of tungsten steel and used, principally for its tungsten content, in the manufacture of steel, is an alloy of tungsten, an alloy used in the manufacture of steel, and a compound of tungsten, it is not within the meaning of any of those provisions in paragraph 302, Tariff Act of 1922. Even if it were, the provision of paragraph 301 for scrap steel fit only to be remanufactured and valued at not more than 7 cents per pound is more specific in that it is an accurate description as to name, character, value, and use. The fact that it may be chiefly used, as compounds of tungsten are, to give a tungsten content to steel does not affect this.

6. ADDITIONAL AND CUMULATIVE DUTIES ON ALLOY CONTENT OF ALLOY STEEL—PARAGRAPH 305, TARIFF ACT OF 1922.

Paragraph 305, Tariff Act of 1922, levies additional duty on the excess alloy content of "steel in all forms and shapes, by whatever process made" and a cumulative duty on the excess tungsten content of "any material provided for in paragraph 304 containing molybdenum and tungsten." The first provision applies only to manufactured steel and does not include steel scrap; nor does paragraph 304 include it.

7. TUNGSTEN STEEL SCRAP.

Waste resulting from the manufacture or repair of high-speed steel tools, usable only by remelting, valued according to its tungsten content at less than 7 cents per pound, known as "tungsten or high-speed steel scrap" or "high-speed steel turnings," chiefly used for imparting a tungsten content to steel, is dutiable under paragraph 301, Tariff Act of 1922, as "scrap steel, valued at not more than 7 cents per pound * * * fit only to be remanufactured." It is not classifiable under paragraph 302 as "metallic tungsten," a "compound of tungsten," or an "alloy of tungsten"; nor is it an alloy used as a substitute for steel in the manufacture of tools under paragraph 304 and subject also to the additional duty provided for such by paragraph 305.

## United States Court of Customs Appeals, March 9, 1927

APPEAL from Board of United States General Appraisers, G. A. 8992, T. D. 40878

[Reversed.]

*Walter Evans Hampton* for appellant.

*Marion De Vries* and *Jesse P. Crawford* (*De Vries, Doherty, Davis & Lamb* of counsel) for appellee.

*William W. Hoppin* and *Charles D. Lawrence*, Assistant Attorneys General (*Oscar Igstaedter*, special attorney, of counsel), for the United States.

Oral argument December 7, 1925, by Mr. Hampton, Mr. Crawford, and Mr. De Vries; and October 18, 1926, by Mr. Hampton and Mr. De Vries]

Before GRAHAM, Presiding Judge, and SMITH, BARBER, BLAND, and HATFIELD, Associate Judges

HATFIELD, Judge, delivered the opinion of the court:

The merchandise involved in this appeal consists of "tungsten steel scrap."

There is some conflict in the evidence as to the exact form of the material, the examiner, Hyder, contending that it consisted largely of pieces of broken tools, while the importer insists it consisted of lathe turnings. The sample offered in evidence is of the latter material. The material was gathered from various steel mills in England and was the waste arising from the manufacture or repair of high-speed steel tools. Testimony introduced by the importer showed the merchandise to have a tungsten content of approximately 14 per centum. It was claimed by the protestant to contain 14½ per centum of tungsten. It was fit only to be remanufactured, and valued at less than 7 cents per pound. It was assessed for duty by the collector under paragraph 301 of the Tariff Act of 1922, which reads as follows:

PAR. 301. Iron in pigs, iron kentledge, spiegeleisen containing more than 1 per centum of carbon, 75 cents per ton; wrought and cast scrap iron, and scrap steel, valued at not more than 7 cents per pound, 75 cents per ton: *Provided,* That spiegeleisen for the purposes of this act shall be an iron manganese alloy containing less than 30 per centum of manganese: *Provided further,* That nothing shall be deemed scrap iron or scrap steel except secondhand or waste or refuse iron or steel fit only to be remanufactured.

The appellee, the York Metal & Alloys Co., an American manufacturer, having complied with the provisions of section 516 (b) of the Tariff Act of 1922, filed a protest against the collector's classification, claiming the imported material to be properly dutiable under paragraph 302 of that act, as "metallic tungsten," or as a "compound of tungsten," or as "an alloy of tungsten not specially provided for," or, alternatively, under paragraph 304 of that act, as "alloys not specially provided for used as substitutes for steel in the manufacture of tools," and with additional rates as provided for in paragraph 305 of the act.

The pertinent part of paragraph 302 reads as follows:

PAR. 302. * * * tungsten ore or concentrates, 45 cents per pound on the metallic tungsten contained therein; ferromanganese containing more than 1 per centum of carbon, 1⅞ cents per pound on the metallic manganese contained therein: *Provided,* That ferromanganese for the purposes of this act shall be such iron manganese alloys as contain 30 per centum or more of manganese; manganese metal, manganese silicon, manganese boron, and ferromanganese and spiegeleisen containing not more than 1 per centum of carbon, 1⅞ cents per pound on the manganese contained therein and 15 per centum ad valorem; ferromolybdenum, metallic molybdenum, molybdenum powder, calcium molybdate, and all other compounds and alloys of molybdenum, 50 cents per pound on the molybdenum contained therein and 15 per centum ad valorem; *ferrotungsten, metallic tungsten, tungsten powder, tungstic acid, and all other compounds of tungsten, 60 cents per pound on the tungsten contained therein and 25 per centum ad valorem; ferrochromium tungsten, chromium tungsten, chromium cobalt tungsten, tungsten nickel, and all other alloys of tungsten not specially provided for, 60 cents per pound on the tungsten contained therein and 25 per centum ad valorem;* ferrosilicon, containing 8 per centum or more of silicon and less than 60 per centum, 2 cents per pound on the silicon contained therein; containing 60 per centum or

more of silicon and less than 80 per centum, 3 cents per pound on the silicon contained therein; containing 80 per centum or more of silicon and less than 90 per centum, 4 cents per pound on the silicon contained therein; containing 90 per centum or more of silicon, and silicon metal, 8 cents per pound on the silicon contained therein; ferrochrome or ferrochromium containing 3 per centum or more of carbon, 3½ cents per pound on the chromium contained therein; ferrochrome or ferrochromium containing less than 3 per centum of carbon, and chrome or chromium metal, 30 per centum ad valorem, ferrophosphorus, ferrotitanium, ferrovanadium, ferrouranium, ferrozirconium, zirconiumferrosilicon, ferroboron, titanium, zirconium, chromium nickel, vanadium nickel, zirconium nickel, chromium vanadium, chromium silicon, zirconium silicon, calcium silicide, *and all alloys used in the manufacture of steel not specially provided for*, 25 per centum ad valorem; cerium metal, $2 per pound;   *   *   *   (Italics ours.)

The pertinent part of paragraph 304 reads as follows:

PAR. 304.   *   *   *   alloys not specially provided for used as substitutes for steel in the manufacture of tools;   *   *   *

Paragraph 305 reads as follows:

PAR. 305.  In addition to the rates of duty provided for in this schedule on steel in all forms and shapes, by whatever process made, and by whatever name designated, whether cast, hot or cold rolled, forged, stamped, or drawn, containing more than six-tenths of 1 per centum of nickel, cobalt, vanadium, chromium, tungsten, molybdenum, or any other metallic element used in alloying steel, there shall be levied, collected, and paid 8 per centum ad valorem: *Provided*, That manganese and silicon shall not be considered as alloying material unless present in the steel in excess of 1 per centum manganese or silicon: *Provided further*, That an additional cumulative duty of 65 cents per pound on the molybdenum content in excess of six-tenths of 1 per centum, and 72 cents per pound on the tungsten content in excess of six-tenths of 1 per centum shall be levied, collected, and paid on any material provided for in paragraph 304 containing molybdenum and tungsten.

The claims made by the protestant on the trial below and insisted upon here are substantially as follows: First, that the provisions contained in paragraph 301 for "scrap steel" are limited to the waste or refuse of ordinary carbon steel, valued at not more than 7 cents per pound and fit only to be remanufactured, and do not include waste or refuse of steel having a tungsten content; second, that the term "scrap steel" had a well-known meaning in the trade and commerce of the United States at, prior to, and ever since the enactment of the Tariff Act of 1922, and that "tungsten scrap steel" was excluded therefrom; and, third, that the material here involved is bought and sold according to the tungsten content and is chiefly used for its tungsten content in the making of "high-speed steels," and is, therefore, properly dutiable under paragraph 302 as "metallic tungsten," or as a "compound of tungsten," or as an "alloy of tungsten," or, alternatively, under paragraph 304, as "alloys not specially provided for used as substitutes for steel in the manufacture of tools," and is, therefore, also subject to the additional duties provided for in paragraph 305.

Several witnesses were called by the protestant on the trial below.

The witness, J. P. Gill, testified: That he was chief metallurgist of the Vanadium Alloys Steel Co.; that "the duties of a chief metallurgist are to draw up specifications for incoming material and outgoing material and to have charge of the scientific work of the plant"; that, while he had never bought or sold any, and had only received the information indirectly, the term scrap steel was limited by the trade and commerce of the country to the refuse or waste of ordinary carbon steel, and that tungsten scrap steel was not included therein; and that tungsten scrap steel is combined with "other scrap steels and whatever ferroalloys may be there" and used in the manufacture of "tungsten steels, particularly high speed steels and tungsten tool steels," although it is also used in the manufacture of valves for automobiles and aeroplane engines, for its tungsten content only.

The witness, A. Grossman, testified that he was a metallurgist, employed by the Alloys Steel Corporation; that "the duties of a metallurgist involve a technical control of plant operation and control of the entire raw materials and specifications for outgoing products"; that a metal containing from 12 to 18 per centum of tungsten is a "tungsten alloy"; that tungsten is introduced into steel to impart several properties, chief of which is "red hardness," and that it is this property which enables "tool steels" to cut when they are at a red heat, the other properties being magnetic hardness and abrasive hardness; that while he had never bought or sold scrap steel and had only come into contact with its purchase and sale indirectly, there was a recognized difference in the trade understanding between tungsten scrap steel and ordinary carbon scrap steel; that *his company* would not consider a delivery of ordinary carbon scrap steel a good delivery upon an order for tungsten scrap steel; that tungsten scrap steel is added to a molten bed of steel to furnish a tungsten content for the manufacture of high-speed steel, tungsten magnet steel, and tungsten tool steel; that it is chiefly used in the manufacture of high-speed steel; that *"the scrap is remelted with other materials to make new high-speed steel"*; and that it is used in lieu of ferrotungsten. (Italics ours.)

Joseph W. Weitzenkorn testified that from 1910 to 1917 he was research manager and metallurgist for the Crucible Steel Co. of America, from 1917 to 1920 he was general manager of the Electric Reduction Co., and from 1920 to 1922 he served in the capacity of vice president of the Molybdenum Corporation of America; that he had purchased both tungsten steel scrap or high-speed steel scrap and ordinary carbon steel scrap, but had never sold either; that, as understood in the trade and commerce of the United States, scrap steel meant "ordinary straight carbon steel scrap"; that the term

tungsten scrap steel meant scrap steel containing from 14 to 18 per centum of tungsten; and that tungsten scrap steel was used, usually in combination with other materials, for making high-speed steel, tungsten magnet steel, automobile valve steel, and as a base for making ferrotungsten.

Edwin J. Jenckes testified that since August, 1922, he had been sales manager of the York Metal & Alloys Co., the appellee; that tungsten scrap steel "is a *scrap steel* which is produced in the manufacture of high-speed steel or tungsten steel"; that tungsten steel scrap is used by his company, "*as one of the component parts of the charge*" in the manufacture of ferrotungsten; that ferrotungsten is usually made from tungsten ore concentrates; that tungsten steel scrap is generally sold on a guarantee of minimum content of tungsten; that the scrap in question is used by his company for both iron and tungsten content, although the tungsten is the element mostly desired; that turnings are recognized as a kind of scrap steel; and that the name "turnings" is used to distinguish such scrap from other kinds of scrap steel. He testified that he bought tungsten scrap steel but had never sold any, and never bought or sold any other steel scrap. (Italics ours.)

Louis B. Lindemuth, called as a witness by the protestant, testified that he was a consulting metallurgist; that, prior to September 21, 1922, while superintendent of the Crucible Electric & Furnace Co., he acquired knowledge of tungsten steel scrap; that this concern used such scrap in the "manufacture of high speed and tungsten steel"; and that, for such purpose, it was sometimes used alone and sometimes used in combination with other materials.

Two other witnesses testified for the protestant, but their testimony is not of importance relative to the issues in the case.

G. W. Gaul was called as a witness by the importer. He testified that he was the buyer or purchasing agent for the Carpenter Steel Co.; that for 18 years he had been buying scrap steels at wholesale in the markets of the United States; and that he had purchased both tungsten scrap steel or high-speed scrap steel and ordinary carbon scrap steel. On the question of commercial designation he testified as follows:

*        *        *        *        *        *        *

Q. Is there in the trade and commerce of the United States prior to September 22, 1922, a well understood and definite class of scrap steel?—A. Decidedly.

Q. That was a definite and a uniform understanding?—A. Yes, sir.

Q. Are you able to state whether it existed generally throughout the United States?—A. I am.

Q. Whether or not this illustrative Exhibit A comes within the family of scrap iron, and scrap steel, known to the trade and commerce of the United States, to which you testified?—A. It does.

Q. The fact that it contains a percentage of tungsten, relegate it outside of that class, or leave it within the class?—A. Oh, no; it is classified as scrap.

Q. This is still within that class?—A. Yes; but a particular kind of scrap steel, the same as I buy—low phosphorous bandings; that is recognized in the trade as a classification.

\*        \*        \*        \*        \*        \*        \*

Q. Do you know tungsten scrap scale?—A. I do.

Q. Is that not within the family of scrap steels?—A. That is in the family of scrap steels.

Q. I am speaking about tungsten steel scale; is that in the family of scrap steel?—A. Yes.

On cross-examination the witness testified that the material involved here was used by his company in the manufacture of high-speed steel, and that the price of such material depended upon the percentage of tungsten content.

Mark L. Tyroler, called by the importer, testified that he was the New York office manager of Luria Bros. & Co. (Inc.); that his company dealt at wholesale in all kinds of scrap and steel and other waste materials; and that he came in contact with the sales of tungsten scrap steel or high-speed scrap steel prior to September 22, 1922. With regard to the commercial meaning of the term scrap steel he testified as follows:

\*        \*        \*        \*        \*        \*        \*

Q. I ask you whether in the wholesale trade and commerce of the United States in September, 1922, there was a general family or class or species of scrap iron and scrap steel?—A. Yes, sir.

Q. Did that, or did that not, include tungsten scrap steel?—A. Yes, it did.

\*        \*        \*        \*        \*        \*        \*

Q. We ask you to look at this illustrative Exhibit A, in this case, and ask you to say whether or not you recognize that?—A. Yes, sir.

Q. What is that?—A. Steel turnings.

Q. Is that within the general family or species in the trade and commerce of the United States, known as scrap iron and scrap steel?—A. Yes, sir; scrap steel turnings.

Q. The fact that it might contain a certain percentage of tungsten, would that still leave it in the family of scrap iron and scrap steels?—A. Absolutely.

Q. Have you ever had anything to do with the collection of these turnings and buying of them?—A. Yes, sir.

\*        \*        \*        \*        \*        \*        \*

On cross-examination he testified that tungsten scrap steel was bought and sold at prices varying according to the tungsten content.

Philip L. Smith, manager of the ore and metal department of H. Hollesen, testified: That he had been engaged for 20 years in buying and selling "pig iron, steel, steel scrap, ferro alloys, metals, copper, tin, lead, and zinc"; that "scrap iron and steel was generally known in the trade as materials that were by-products or waste products, materials that could be worked over, remanufactured, re-moulded, or re-rolled"; that the term high-speed steel turnings and tungsten steel scrap were used synonymously in the trade; and that such material was considered in the trade as being within the family of scrap steel.

Harvard L. Warner, called as a witness by the importer testified: That he was the manager of the New York office of Frank Small & Co.; that he had been buying and selling scrap iron and scrap steel for approximately 14 years; that tungsten steel scrap was considered in the trade and commerce of the United States as being in the family of scrap steel; and that the presence of from 13 to 14 per centum of tungsten contained therein would not exclude the material from the general class of scrap steel.

On cross-examination he testified: That high-speed scrap steel was bought and sold on a guarantee as to the percentage of tungsten content; that, in that respect, it was in a class by itself; but that it was, nevertheless, known and considered in the trade as being within the family of scrap steel.

Thomas R. Allen, secretary of the Lindley Iron & Steel Co., having charge of the purchase and sale of scrap iron and scrap steel for that company, testified that he was familiar with tungsten steel scrap. Upon the question of commercial designation the witness testified as follows:

\*       \*       \*       \*       \*       \*       \*

Q. Did you know in the trade and commerce of the United States prior to September 22, 1922, whether or not there was a general class or genus of scrap iron and steel?—A. Yes, sir.

Q. Would that include this illustrative exhibit which is on the bench there?—A. Yes, sir.

Q. The fact that it had a certain percentage of tungsten would still leave it in that class, would it?—A. Yes, sir.

\*       \*       \*       \*       \*       \*       \*

C. C. Wilson testified that he was connected with the Carpenter Steel Co. of Reading; that he was in charge of the production of steel in the electric melting department; that he made a careful examination of the merchandise involved in this case and that it consisted of high-speed steel turnings, or tungsten steel scrap in the form of turnings; that an analysis of the material showed it to contain approximately 14 per centum of tungsten; and that material of this character is used by his company for both the iron and tungsten contents, together with straight carbon scrap steel, such other materials being added to the charge as an analysis may show to be necessary in order to bring the metal to the required specifications, and that some of the materials added for such purposes are ferrotungsten, ferrochrome, and ferrovanadium.

James W. Bradin, called as a witness for the importer, testified that he was connected with Tanner & Co.; that he sold ores and ferroalloys chiefly, but also scrap iron and scrap steel, including high-speed or tungsten steel scrap; that, while his company did not handle steel turnings, he knew that material and that it was included com-

mercially within the family of steel scrap, "and that the presence of tungsten did not exclude the material from the general family of scrap steel."

We think the foregoing is a fair statement of the evidence material to the issues in the case.

Upon this record the trial court made the following specific findings of fact:

1. The importation consists of tungsten steel scrap obtained in the process of manufacturing high-speed steel.

2. It contains 14½ per cent tungsten.

3. It is valued at less than 7 cents per pound.

4. It is bought and sold as "tungsten steel scrap," and as imported is fit only for remanufacture.

5. While bought and sold entirely for its tungsten content, the exact percentage of tungsten is not guaranteed by the seller, the purchaser usually relying on his own analysis to enable him to secure a material which contains sufficient tungsten to meet his specific requirements.

The trial court also held that paragraph 301 was limited to the waste or refuse of ordinary straight carbon steel and did not include scrap steel containing, at least to any appreciable extent, any of the alloying elements which enter into the composition of high-speed steel; and that, while the imported material had the appearance of "mere scrap steel," it was, nevertheless, known commercially as "tungsten steel scrap" and "dealt in solely for its tungsten content, a commodity which is conceded to constitute an alloying element which enters into the composition of high-speed steels." The court in its opinion further said:

We are therefore of opinion that the present importation must be excluded from paragraph 301, first, because the proof herein submitted, though voluminous, is by no means conclusive that the term "scrap steel" either commonly or commercially includes or describes the particular commodity known and dealt in as "tungsten steel scrap" or that an order for the latter would be satisfactorily filled by a delivery of the former; secondly, for the all-important reason that we are convinced that Congress intended that special and highly alloyed steels and the scrap thereof should be excluded from said paragraph, and to that end has specially provided elsewhere therefor.

The court further held that the imported material was a compound of tungsten and dutiable as such at 60 cents per pound on the tungsten content and 25 per centum ad valorem under paragraph 302, and that it was also subject to the additional duty of 8 per centum ad valorem provided by paragraph 305, and, accordingly, sustained the protest.

The question of commercial designation is one of fact, and the burden of proof rests upon the party asserting the claim. *Meyer & Lange et al.* v. *United States*, 3 Ct. Cust. Appls. 247, T. D. 32565; *United States* v. *Walter et al.*, 4 Ct. Cust. Appls. 95, T. D. 33371; *United States* v. *Sheldon & Co. et al.*, 5 Ct. Cust. Appls. 371, T. D. 34555; *Straus & Co. et al.* v. *United States*, 7 Ct. Cust. Appls. 414,

T. D. 36982; *Tower & Sons* v. *United States*, 11 Ct. Cust. Appls. 261, T. D. 39080.

In this case the protestant raised the issue of commercial designation. It was claimed that "tungsten scrap steel," or "high-speed scrap steel" was not included within the trade understanding of the term "scrap steel," and that, upon an order for scrap steel, a delivery of tungsten scrap steel would not be a good delivery.

To maintain this issue the protestant called several witnesses, only one of whom had ever bought or sold ordinary carbon scrap steel or tungsten scrap steel. The one witness for the protestant who had ever bought or sold scrap steel and was qualified to testify in that regard was Joseph W. Weitzenkorn, vice president and general manager of the Molybdenum Corporation of America. He testified that in the trade the term "scrap steel" was understood to mean ordinary straight carbon steel scrap; that the term "tungsten steel scrap" was understood to mean scrap steel containing tungsten; and that the latter material was not within the trade understanding of the term "scrap steel."

In order that he may have the qualifications to speak with authority upon the question of commercial designation, a witness must have actual knowledge of wholesale commercial transactions. Accordingly, a metallurgist, who has "charge of incoming raw materials and specifications for outgoing materials," who has never bought or sold ordinary carbon scrap steel or tungsten scrap steel, or has not otherwise learned of trade designation from actual experience in wholesale commercial transactions, but depends upon his technical experience in the manufacture of steel and upon general conversations and hearsay statements for information upon the subject, is not qualified to speak with authority upon the question of commercial designation. *Masson et al.* v. *United States*, 3 Ct. Cust. Appls. 420, T. D. 33000; *Tower & Sons* v. *United States*, 11 Ct. Cust. Appls. 261, T. D. 39080; *United States* v. *Globe Overseas Corporation*, 13 Ct. Cust. Appls. 10, T. D. 40849.

Several witnesses experienced for years in the purchase and sale of steel scrap of various kinds, including the class of material involved in this case, testified that tungsten steel scrap or high-speed steel scrap was known in the trade as one of the kinds of steel scrap and was included within the commercial understanding of the term "scrap steel."

The trial court found that the involved merchandise was known in the trade and bought and sold as "tungsten steel scrap." The court did not affirmatively find that "tungsten steel scrap" was not within the trade understanding of the term "scrap steel." On the contrary the court, in this connection, said:

We are therefore of opinion that the present importation must be excluded from paragraph 301, first, *because the proof herein submitted, though voluminous, is*

*by no means conclusive that the term "scrap steel" either commonly or commercially includes or describes the particular commodity known and dealt in as "tungsten steel scrap" or that an order for the latter would be satisfactorily filled by a delivery of the former; * * * (Italics ours.)*

The burden of proving commercial designation was upon the protestant, not upon the importer. The latter was attempting to sustain the decision of the collector that the merchandise consisted of "scrap steel." Moreover, it was not incumbent upon either party to prove commercial designation conclusively. It is sufficient if it has been proved by a fair preponderance of the evidence. *Straus & Co. et al.* v. *United States*, 7 Ct. Cust. Appls. 414, T. D. 36982.

The record shows that the involved merchandise was known in the trade by several names. It had at least three distinct trade designations: "tungsten steel scrap," "high-speed steel scrap," and "high-speed steel turnings."

We are of opinion that the protestant failed to establish by a fair preponderance of the evidence that the merchandise was excluded from the trade understanding of the term "steel scrap." It is true that "tungsten steel scrap" is a particular class of steel scrap, but steel scrap, nevertheless. *Tower & Sons et al.* v. *United States*, 11 Ct. Cust. Appls. 157, T. D. 38948. It seems clear to us from the record, that, except in cases where there is a clear and prior understanding between the purchaser and seller of scrap steel as to the particular class or kind or grade of scrap steel desired by the purchaser, such class or grade must be stated in orders for same, or the seller would be unable to intelligently fill the order or make delivery. This is true of various commercial commodities. See *Tower & Sons et al.* v. *United States, supra; Overton & Co.* v. *United States*, 5 Ct. Cust. Appls. 183, T. D. 34322.

Steel has been defined as—

* * * a compound or alloy of iron that will forge, harden, and temper (Crooker). This includes iron in combination with various other elements besides carbon, as silver, tungsten, chromium, titanium, cyanogen, silicon.

Ordinary steel contains from 0.5 to 1.5 per cent of carbon. Its hardness and fusibility increase with the amount of carbon, and when this element is in excess it becomes cast-iron. When the proportion of carbon is small, the metal is termed *mild* or *low* steel; high steels are those containing a large proportion of carbon.

K. *Tungsten steel*, a steel containing tungsten. Its production is similar to that of chromium steel, tungsten or Wolframite being substituted for the chromium compounds. Its properties are also similar, and it is an excellent *tool-steel*, though great difficulty is experienced in obtaining uniformity in the product. It is also remarkable for its great magnetic capacity. (Knight's American Mechanical Dictionary, pp. 2363 and 2366.)

Funk & Wagnalls New Standard Dictionary defines steel as follows:

Steel, n. 1. Any one of many compounds of iron (chiefly with carbon) that is decidedly malleable at some high temperature and capable of hardening greatly

by sudden cooling. Its carbon content varies from .3 to 2.2 per cent, and it includes most common alloys of iron that are neither distinctly wrought iron nor cast iron. Varieties of steel are classified according to: (1) the presence or absence of slag; as, slagless steel or slag bearing s.; (2) their carbon content; as, decarbonized s., low carbon s., or mild s. (containing from .05 to .3 per cent of carbon, and used for wire and ship plates), medium carbon s. (containing from .3 to .8 per cent of carbon, and used for axles and rails), high carbon s. (containing from .8 to 2 per cent of carbon and little used, except when hardened and tempered); (3) their alloys; as, aluminum s., chrome s., manganese s., etc.;   *   *   *
I conceive it (steel) to consist (A) of a matrix of iron which is sometimes (as in ingot-iron and annealed *steel*) comparatively, or even quite pure, and sometimes (as in hardened *steel*, manganese *steel*, etc.) chemically combined with a portion, or even the whole of the other elements which are present, probably in indefinite ratios, its mechanical properties being greatly affected by them; and (B) of a number of independent entities which we may style "minerals," chemical compounds of the elements present, including iron, which crystallize within the matrix, and by their mechanical properties, shape, size, and mode of distribution, also profoundly affect the mechanical properties of the composite mass, though probably less profoundly than do changes of corresponding magnitude in the composition of the matrix.   H. M. Howe Metallurgy of Steel, vol. 1 §1, p. 2. (Sci. Pub. Co. 1894.)   *   *   *   —alloy steel, an alloy of iron with a metal, as chromium, manganese, or nickel, which imparts certain properties to the alloy.   *   *   *   Tungsten s. or wolfram (containing from 5 to 10 per cent of tungsten and .4 to 2 per cent of carbon), a hard alloy which does not lose its hardness by friction with iron, and is hence used for iron-cutting tools and for magnets;   *   *   *   (Italics quoted.)

*Steel* is iron which is malleable at least in some one range of temperature, and also is either (a) cast into an initially malleable mass, or (b) is capable of hardening greatly by sudden cooling, or (c) is both so cast and so capable of hardening. (Tungsten steel and certain classes of manganese steel are malleable only when red-hot.)

Normal or carbon steel contains between 0.30 and 2.20% of carbon, enough to make it harden greatly when cooled suddenly, but not enough to prevent it from being usefully malleable when hot.   *   *   *

*Alloy steels* and *cast irons* are those which owe their properties chiefly to the presence of one or more elements other than carbon. (The Encyclopedia Britannica, 11th ed., Vol. XIV, p. 802.)   (Italics quoted.)

Our attention has been called by counsel for appellee to the fourth edition of "The Making, Shaping, and Treating of Steel," published by the Carnegie Steel Co., Pittsburgh, Pa., and we quote from Chapter IV, pages 715 and 716, thereof:

Definitions: So many different elements may occur naturally in steel, or be added to it, in such varying amounts with corresponding variations in effects, that it is a difficult matter to determine just what constitutes an alloy steel even from the standpoint of chemical composition alone. When it is further considered that the different methods of manufacture also exert their influence, and that certain elements may be added or allowed to remain for widely different reasons, the difficulty of wording concisely an adequate definition becomes more apparent. The definition adopted by the International Association for Testing Materials is as follows: "Alloy steel is *steel* which owes its distinctive properties chiefly to some element or elements other than carbon, or jointly to such other elements and carbon. Some of the alloy steels necessarily contain an important

percentage of carbon, even as much as 1.25 per cent. There is *no agreement as to where the line between alloy steel and carbon steel shall be drawn.*" In this connection it is well to note that *elements other than carbon* are always to be desired *in steel,* of commercial grade, at least. Such elements may *be added or permitted to remain* for three distinct reasons, namely, (1) to correct or prevent defects that otherwise would be liable to occur in the final product; (2) *to impart to the steel some distinctive property or to improve materially its natural properties;* (3) *to form alloys* for the purpose of experimentation and investigation. * * * With these facts in mind, we agree with Henry D. Hibbard, who suggested the following definitions: "*Simple steel,* which is often called carbon steel (or plain steel), consists chiefly of iron, carbon, and manganese. Other elements are always present, but are not essential to the formation of the steel, and the content of carbon or manganese, or both, may be very small." "*Alloy steel* is steel that contains one or more elements other than carbon in sufficient proportion to modify or improve substantially and positively some of its useful properties." These steels, since they contain a special element, are sometimes called special steels. * * * A definition that would agree with the customs of this company, then, would appear to be the following: An alloy steel is steel, made by the open-hearth or the electric process, which contains, in addition to carbon, some element or elements added with the object of modifying and substantially improving its mechanical properties in such a way *as to make it more suitable for the purpose for which it is intended.* (Italics ours.)

From the quoted definitions it plainly appears that there are various kinds of steel. The normal or ordinary carbon steels are of many and different classes and serve many and diversified uses. The special or alloy steels are many and serve a great number of important uses. Tungsten and other alloying elements are added to make high grade or fine *steel.* When added they improve the "mechanical properties" of steel in such manner as to make it more suitable for the purpose for which it is intended. Such alloy steels are steels, and are commonly recognized, understood, and used as such. See *United States* v. *Roessler & Hasslacher Chemical Co.,* 137 Fed. 770, 773.

With these observations we proceed to a consideration of paragraphs 301, 302, 304, 305, and 306 of the Tariff Act of 1922, in order that we may determine the congressional purpose as expressed therein.

Paragraph 301 provides for "scrap steel, *valued at not more than 7 cents per pound,*" at 75 cents per ton. It also provides: "that nothing shall be deemed scrap iron or steel except *second-hand* or *waste* or *refuse* iron or *steel fit only to be remanufactured.*" (Italics ours.)

It will be observed that there are two express limitations as to the operation of the paragraph. In order that a material may be classified under the provision for scrap steel, it must be valued at no greater sum that 7 cents per pound, and it must be a waste or refuse steel fit only to be remanufactured. It must, of course, be steel, but there is no other express limitation contained in the paragraph as to the kind or class of steel provided for. The Congress was informed, con-

structively at least, that there were various classes of ordinary carbon steel as well as classes of special steels or alloy steels. There being nothing in the paragraph itself to suggest that the Congress intended to limit it to ordinary carbon steel, as claimed by the appellee, we will examine other provisions of the act in order to determine the congressional purpose. Paragraph 302 provides, among other things, for "tungsten ore or concentrates," at "45 cents per pound on the metallic tungsten contained therein"; for "ferrotungsten, metallic tungsten, tungsten powder, tungstic acid, and all other compounds of tungsten, 60 cents per pound on the tungsten contained therein and 25 per centum ad valorem"; for "all other alloys of tungsten not specially provided.for," at the rate of duty provided for compounds of tungsten; and for "all alloys used in the manufacture of steel not specially provided for, 25 per centum ad valorem."

Paragraph 304 provides for manufactured steel in different forms, and also contains the provision for "alloys not specially provided for used as substitutes for steel in the manufacture of tools."

Paragraph 305 provides for an additional duty of 8 per centum on "steel in all forms and shapes, by whatever process made, and by whatever name designated, whether cast, hot or cold rolled, forged, stamped, or drawn, containing more than six-tenths of 1 per centum of nickel, cobalt, vanadium, chromium, tungsten, molybdenum, or *any other metallic element used in alloying steel.*" It also provides for an additional cumulative duty of 72 cents per pound on the "tungsten content in excess of six-tenths of 1 per centum" contained in any material provided for in paragraph 304.

In paragraph 306 the Congress defines steel. as follows:

PAR. 306. All metal produced from iron or its ores, which is cast and malleable, of whatever description or form, without regard to the percentage of carbon contained therein, whether produced by cementation, or converted, cast, or made from iron or its ores, by the crucible, electric, Bessemer, Clapp-Griffith, pneumatic, Thomas-Gilchrist, basic, Siemens-Martin, or open-hearth process, or by the equivalent of either, or by a combination of two or more of the processes, or their equivalents, or by any fusion or other process which produces from iron or its ores a metal either granular or fibrous in structure, which is cast and malleable, excepting what is known as malleable-iron castings, shall be classed and denominated as steel.

It would seem that by this definition the Congress has declared that, for the purposes of the act, all metal produced from iron or its ores, which is either granular or fibrous in structure, and which is cast and malleable, excepting malleable-iron castings, without regard to the percentage of carbon contained therein, whether produced by the several processes mentioned therein, or a combination thereof, or *by any fusion or other process, shall* be classed and denominated steel. It is interesting to note that the only material or article expressly excluded from the paragraph is "malleable-iron castings."

We quote from the Encyclopædia Britannica, eleventh edition, Vol. XIV, at page 802:

Cast iron is, generically, iron containing so much carbon (2.20% or more) or its equivalent that it is not *usefully malleable at any temperature.* * * * *Malleable cast iron* is iron which has been cast in the condition of cast iron, and *made malleable by subsequent treatment without fusion.* (Italics ours.)

Does this definition exclude the so-called special steels or alloy steels, such as tungsten steel, or steel containing tungsten? We think this question has been definitely determined by the Congress itself by the provisions contained in paragraph 305. The Congress has there expressly provided for additional duties on *manufactured* steel containing more than six-tenths of 1 per centum of tungsten. It has definitely recognized, for tariff purposes, that steel is steel, even though it contains tungsten. Of course, a compound of tungsten and iron, with such high percentage of tungsten as would take the material out of the steel class, was not intended by the Congress to be classed as steel. However, the presence of tungsten in certain *steels* has been plainly recognized by the Congress in the provisions under consideration and an additional duty on the tungsten content of such *steels* has been provided therein. The Congress in paragraph 305 has referred to "tungsten" as a "metallic element used in *alloying steel.*" (Italics ours.)

Moreover, in the quotation taken from the book published by the Carnegie Steel Co., entitled "The Making, Shaping, and Treating of Steel," we find the following:

In this connection it is well to note that *elements other than carbon are always to be desired in steel of commercial grade, at least.* Such elements may be added or permitted to remain for three distinct reasons, namely, (1) *to correct or prevent defects that otherwise would be liable to occur in the final product;* (2) to impart to the steel some distinctive property or to improve materially its natural properties; (3) to form alloys for the purpose of experimentation and investigation. * * * With these facts in mind, we agree with Henry D. Hibbard, who suggested the following definitions: "*Simple steel,* which is often called carbon steel (or plain steel), consists chiefly of iron, carbon, and *manganese. Other elements are always present,* but are not essential to the formation of the steel, and the content of carbon or manganese, or both, may be very small. * * *" (Italics not quoted.)

Thus it will be seen that, were we to follow the contention, vigorously insisted upon, that the Congress intended to limit steel and steel scrap to such as was composed of iron and carbon only, there would be little, if any, steel scrap classifiable under paragraph 301. Furthermore, it will be observed that the metal schedule, beginning with paragraph 307 and extending to and including paragraph 400, contains a large number of provisions for a great variety of manufactured products. Of these, 41 paragraphs relate to articles made wholly or partly of steel. If it should be held that the Congress

intended to limit steel and the scrap thereof to such as was composed of iron and carbon only, it would follow that, if any of the steel articles provided for in paragraphs 307 to 400, inclusive, were made of steel which contained any element other than iron and carbon, such article, although obviously intended to be provided for therein, would be excluded therefrom—which is a *reductio ad absurdum.*

If it could be fairly argued that the Congress intended, by its definitions of steel, to exclude for tariff purposes all such steel as contained an *appreciable* amount of any alloying material; the contention might be worthy of serious consideration. But it is obvious that such a construction of the statute is not warranted by anything contained therein. And so we are confronted with the alternative of holding that the statutory definition of steel covers all steel, except such as is expressly excluded, or only such as contains nothing but iron and carbon. Having demonstrated the absurdity of the second alternative, we must rest upon the first.

Giving consideration to the presumption that the Congress was fully informed concerning the matter upon which it attempted to legislate, and knowing that, as commonly understood, steel is composed of a variety of elements and has many and diversified uses, depending upon the elements of which it is composed, and that tungsten and other alloying materials are extensively used in the manufacture of steel and are important elements therein, and having expressly recognized this fact and provided therefor in paragraph 305, it seems reasonable to suppose that had it been intended to limit the operation of paragraph 301, as far as the issues in this case are concerned, to ordinary carbon steel, it would have been plainly so provided. See *Ball et al.* v. *United States,* 8 Ct. Cust. Appls. 143, T. D. 37271.

On the contrary the Congress provided that *scrap steel, valued at not more than 7 cents per pound,* should be dutiable at 75 cents per ton: Provided that nothing should *be deemed scrap steel* except *second hand* or *waste* or *refuse steel fit only to be remanufactured.* The kind of waste or refuse steel provided for is plainly unlimited, except as to value and as to its fitness for use.

Paragraph 301 recognizes that there is *scrap* steel worth more than 7 cents per pound. Paragraph 304 recognizes that there is *manufactured* steel worth less than 1 cent per pound. The scrap steel in question contains approximately 14 per centum of tungsten, yet it is valued at only 5 cents per pound. If it contained no tungsten, it would seem, from the record in the case, that it would be worth even less. It is interesting to note in this connection that the protestant's witness, J. P. Gill, testified that tungsten scrap steel in the United

States contained approximately from 10 to 18 per centum of tungsten, with that containing 18 per centum predominating. He then said:

Q. The price of tungsten scrap steel would run about 8 cents a pound, would it?—A. Approximately if the tungsten content is 15 to 18 per cent.

Q. Well, over 18 per cent, how high would it run in value?—A. About 18 cents, at the present market.

Is it not inferable that the Congress, recognizing the existence of tungsten and other alloying materials in steel, as it did by express language in paragraph 305, intended to include the scrap of such steel in paragraph 301, provided the alloy content was not high enough to make it worth more than 7 cents per pound? If scrap steel containing tungsten or other alloying materials was not intended to be included in paragraph 301, then of course the limitation as to value was intended to apply only to ordinary carbon steel scrap, fit only to be remanufactured. The reason for the exclusion of ordinary carbon steel scrap valued at more than 7 cents per pound, if such there be, is not clear to us. On the contrary, if the paragraph was intended to include scrap steel containing tungsten or other alloying materials, the reason for the limitation as to value is apparent.

It seems plain to us that the express limitations contained in the paragraph are the only limitations intended by the Congress to be applied in construing the provisions thereof. As thus construed the paragraph includes all kinds and classes of refuse or waste steel, if fit only to be remanufactured and if valued at not more than 7 cents per pound.

The record discloses that the merchandise is valued at less than 7 cents per pound, that it is second hand or refuse or waste steel having a tungsten content, and that it is no longer fit for the use for which it was manufactured. Is it fit only to be remanufactured?

In its findings of fact the trial court found as follows: "4. It is bought and sold as 'tungsten steel scrap,' *and as imported is fit only for remanufacture.*" (Italics ours.) The court, however, held that, as paragraph 301 was limited to the waste or refuse of ordinary carbon steel fit only to be remanufactured, the involved merchandise did not come within its provisions.

This holding is in accord with the contention of counsel for the appellee. Counsel also contend, however, that the doctrine of chief use requires the classification of the merchandise as a compound of tungsten, or metallic tungsten, or as an alloy of tungsten, or as an alloy used in the manufacture of steel, which are provided for in paragraph 302, or as an alloy used as a substitute for steel, provided for in paragraph 304.

We have found from the definitions of steel hereinbefore quoted that steel containing tungsten is steel or alloy steel. It has several

designations in the trade and is used in the manufacture of tools. Manifestly, it could not be classified when so used, as a substitute for the thing it is, namely, steel or alloy steel. In our opinion the provision contained in paragraph 304 for "alloys not specially provided for used as substitutes for steel in the manufacture of tools," was not intended to include the material in question.

The claim that it is metallic tungsten and properly dutiable as such is disposed of by the testimony of J. P. Gill, chief metallurgist, Vanadium Alloys Steel Co., who, testifying for the protestant, said:

\*        \*        \*        \*        \*        \*        \*

Q. And do you use tungsten powder?—A. We have, yes.

Q. That is about 100 per cent tungsten?—A. It varies from 96 per cent to 100 per cent.

Q. *And metallic tungsten how much?*—A. Ninety-six per cent.

\*        \*        \*        \*        \*        \*        \*

The material involved here contains approximately 14 per centum of tungsten. It can not be classified, therefore, under paragraph 302, as "metallic tungsten."

We come now to a consideration of the claim made by the appellee, which was sustained by the trial court, that second-hand or waste or refuse steel containing approximately 14 per centum of tungsten, valued at less than 7 cents per pound and fit only to be remanufactured, is properly classifiable as a "compound of tungsten," under paragraph 302. It is contended that the merchandise is properly dutiable as a "compound of tungsten" because, as it is claimed, it is used as such in the manufacture of "high-speed steel." It can not be disputed that the merchandise is bought and sold on the basis of the tungsten content. It is true that several of the witnesses stated that it is used in lieu of ferrotungsten in the manufacture of high-speed steel; that is, it is added in its imported condition to the "charge" to give a tungsten content. Some of the witnesses also stated that it was also desired and used for the other elements contained in the scrap material. It is not a manufactured compound. It is a waste or refuse resulting from the processing of a manufactured steel—a steel made of several elements, including tungsten in such quantity as to give the steel certain qualities, such as red hardness, magnetic hardness, and abrasive hardness.

In *Monticelli Bros.* v. *United States*, 8 Ct. Cust. Appls. 21, we said:

The citation of authorities is unnecessary to satisfy the mind that a compound or combination in the general understanding is necessarily something composed of more than one component material. The words themselves imply that requirement because a compound or combination is a thing which results from the act of compounding or combining, and that obviously is the putting together or mixing in some manner of the materials requisite therefor.

This material is composed of more than one element. It contains at least three elements, iron, carbon, and tungsten. It is, therefore,

in a general sense, a compound. But it does not result from the act of compounding or combining iron, carbon, and tungsten. The result of that combination was high-speed steel, manufactured for a definite purpose and use. The high-speed steel was not intended or designed to have the uses of ferrotungsten, metallic tungsten, tungsten powder, or tungstic acid, but was intended, having the qualities which it possessed, to serve the purposes and uses of such steel. We do not think that it can be seriously contended that high-speed steel is either a compound or an alloy of tungsten for tariff purposes.

It will be observed that the Congress in paragraph 302 has distinguished between *compounds* of tungsten and *alloys* of tungsten. The provision for "all other compounds of tungsten" is immediately preceded by the provision for "ferrotungsten, metallic tungsten, tungsten powder," and "tungstic acid"; while the provision for "all other alloys of tungsten not specially provided for" is preceded by the provision for "ferrochromium tungsten, chromium tungsten, chromium cobalt tungsten," and "tungsten nickel." Generally speaking, all of the enumerated materials may be "alloys of tungsten," or "compounds of tungsten." The duty is to be assessed upon the tungsten content of each class of materials and each bears the same rate of duty. Nevertheless, the Congress has separately provided for these materials, classifying those enumerated in the first group as "compounds of tungsten" and those in the latter group as "alloys of tungsten." No such distinction was made in the tariff act of 1913. Note paragraph 102 of that act. Obviously the merchandise, if classifiable under this paragraph, is not both a compound of tungsten and an alloy of tungsten.

The provisions for "compounds of tungsten" and "alloys of tungsten" are unlimited both as to value and as to use. The provision for "alloys used in the manufacture of steel" is unlimited as to value, nor is it limited to one use only. See *Brown & Co.* v. *United States*, 7 Ct. Cust. Appls. 309, T. D. 36781, and cases therein cited.

It would seem to us that, if steel containing tungsten is not steel, and, if tungsten steel scrap is not *steel scrap* because it contains tungsten, as claimed by counsel for the appellee, such material could not be dutiable as an "alloy used in the manufacture of *steel*." (Italics ours.) Obviously, if the presence of tungsten removes the material from the provisions for steel scrap, the presence of tungsten would likewise prevent such material from being classified as an alloy used in the manufacture of *steel*. Counsel for appellee, in their reply brief, agree with this proposition.

It will be noted that paragraph 301 is expressly limited: First, to "scrap steel"; second, as to the value thereof; and third, to fitness for one use only, namely, that of remanufacture.

Assuming, without deciding, that the involved material is not only scrap steel, fit only to be remanufactured and valued at less than 7 cents per pound, but that it is also a "compound of tungsten," or an "alloy of tungsten," or an "alloy used in the manufacture of steel," it can not for a moment be doubted that it is more specifically provided for under paragraph 301, which accurately describes the merchandise, as to name, character, value, and use.

The trial court held, and properly so, we think, that the material in question was fit only to be remanufactured.

It is, however, urgently contended by counsel for the appellee, that, as it is chiefly used for the purpose of giving a tungsten content to steel in the process of the manufacture of high-speed steel, and, as thus used, takes the place of ferrotungsten, which otherwise would be used to give a tungsten content to the steel, it must be classified as a "compound of tungsten" under the provision therefor. It should be observed, however, that, while it is used for the tungsten contained therein, it is in fact used in a process of remanufacture. It is remelted and remanufactured into the very thing it was originally, that is, high-speed steel. In order to do this, it may, as it sometimes is, be used alone; or it may be added to a charge containing other steel scrap in order to give the necessary tungsten content. When used with other steel scrap, it may be necessary to add ferrotungsten or some other compound of tungsten in order to secure the correct proportion of tungsten. But whether used alone or in combination with other materials in the manufacture of high-speed steel, or in combination with other and different materials in the manufacture of some other kind of steel or some entirely different product, it, nevertheless, must be remelted—remanufactured—in order to be of any commercial use. It is, of course, used for the elements which it contains. It would not be used in a process of remanufacture for any other purpose. The mere fact that one of its elements is more desired than the others in its remanufacture into its parent material or into some other material, is not sufficient to take it out of the class of merchandise to which it properly belongs.

Ought we to hold that, in order to come within the provisions of paragraph 301, refuse or waste steel must be fit only to be remanufactured, but, if in a process of remanufacture, it should be used in any manner so as to indicate a preference of the manufacturer for one of its constituent elements, it would then and in that event be removed from the paragraph? What difference does it make what particular element contained therein is most desired by steel manufacturers or others, if the imported material is fit only to be remanufactured, and is in fact used for that very purpose? Of what importance is the method of remanufacture or character of the resultant product? In the final analysis it must be said that it is commercially

useless unless remanufactured, and is, therefore, commercially fit only to be remanufactured.

The doctrine of use, limited to that of fitness for remanufacture only, must be applied in order to determine whether waste or refuse steel is dutiable under paragraph 301. If it meets that test, and the test as to value prescribed therein, it is dutiable under that paragraph. It is our opinion that the doctrine of chief use can not be invoked to remove scrap material, which has met the tests provided in paragraph 301 from the operation of that paragraph, and that it was not the intention of the Congress to include such material under any of the provisions of paragraph 302.

The Congress has provided in paragraph 305 for an additional duty of 8 per centum ad valorem on "steel in all forms and shapes, *by whatever process made,* and by whatever name designated, whether cast, hot or cold rolled, forged, stamped, or drawn, containing more than six-tenths of 1 per centum of  * * *  tungsten, * * * " and an additional cumulative duty of 72 cents per pound on the tungsten content in excess of six-tenths of 1 per centum of any "material provided for in paragraph 304 containing molybdenum and tungsten." (Italics ours.) We are of opinion that the operation of the first provision contained in paragraph 305 is limited by express terms to manufactured steel or manufactures thereof, and was not intended to cover waste or refuse steel provided for in paragraph 301. The involved material is but a waste or refuse. It is not the result of manufacturing processes designed to produce it. *United States* v. *Downing & Co. (Inc.),* 14 Ct. Cust. Appls. 194, T. D. 41702.

The second cumulative duty provided for in the paragraph is limited to the materials covered by paragraph 304. The involved material is not included in that paragraph.

The Congress might well have provided that scrap steel having a tungsten content should be covered by the provisions of paragraph 305. It did not do so, and it is not within our province to extend the operation of the paragraph beyond its plainly prescribed limitations.

It is urged by counsel for the appellee, in support of the various claims presented, that the Congress has, by the provisions contained in paragraphs 302, 304, and 305, clearly indicated the purpose of subjecting *tungsten in excess of six-tenths of 1 per centum,* wherever found, to a substantially high rate of duty. That may have been the congressional purpose. But if so, is it not strange that, when paragraph 301 was before it for consideration, suitable language was not incorporated to indicate this intention? Paragraph 305 might well have been extended to include waste and refuse steel, but the Congress with its purpose clearly defined limited the operation of that paragraph to the materials contained in paragraph 304 and to manufac-

tured steel. Evidently paragraph 302 was carefully considered, and there is no indication whatever, in our opinion, that tungsten scrap steel valued at less than 7 cents per pound and fit only to be remanufactured was intended to be included within any of its provisions. Why tungsten in excess of six-tenths of 1 per centum contained in manufactured steel and in the materials "provided for in paragraph 304 containing molybdenum and tungsten" should be subjected to special rates of duty, and tungsten to the extent of 14 per centum contained in the scrap of like materials should be subjected to the comparatively low rate of duty of paragraph 301 is a question which must be left to the legislative branch of the Government.

We are, of course, limiting this decision to the issues before us. The question of the tariff status of steel scrap not covered by paragraph 301, should be and will, therefore, be left for such consideration as the question merits when the issue is properly presented.

The judgment is *reversed*.

DISSENTING OPINION

GRAHAM, Presiding Judge: I find myself unable to concur in the opinion of the majority in this case.

The material imported was gathered from the steel mills of England and consisted of the turnings or machine waste arising from the manufacture of high-speed tools, and was steel which had a tungsten content of from 13½ to 14 per centum. The evidence shows that this material is chiefly used in the manufacture of high-speed tools, as an alloy, with an occasional use in making valves for automobiles and airplane engines. In use it is added, in its condition as imported, and cold, to a molten steel charge in a furnace, to add a tungsten content to the steel. The molten mass in the furnace is tested from time to time, and more of this material added until the right proportions are arrived at by analysis. As thus introduced into ordinary carbon steel, the tungsten content in this material imparts several qualities, the chief one of which is what is called red hardness, or the capacity of the finished tool steel to cut when such steel is at red heat. The tungsten content also adds magnetic hardness and abrasive hardness. The testimony shows that this material was bought for the purposes above stated and is uniformly sold on the basis of its tungsten content. This is conceded by the majority opinion.

The material imported was classified by the collector as scrap steel under paragraph 301 of the Tariff Act of 1922, which provides, in part:

301. * * * scrap steel, valued at not more than 7 cents per pound, 75 cents per ton: * * * *Provided further*, That nothing shall be deemed scrap iron or steel except secondhand or waste or refuse iron or steel fit only to be remanufactured.

The protest makes alternative claims. It is first insisted that the material is dutiable under paragraph 302 of said act as metallic tungsten or as a compound of tungsten, at 60 cents per pound on the tungsten contained therein and 25 per centum ad valorem. In the alternative it is claimed the material is dutiable under paragraph 304 of said act as "alloys not specially provided for used as substitutes for steel in the manufacture of tools." It is also insisted that the material is subject to the additional rates of duty provided by paragraph 305 as steel in all forms and shapes containing more than six-tenths of 1 per centum of tungsten. These various paragraphs are fully set out in the majority opinion and need not be repeated here.

The court below held, after hearing a considerable amount of testimony, that the protest should be sustained and that the goods were dutiable under paragraph 302 as a compound of tungsten and were also subject to the additional duty provided in said paragraph 305. The judgment of the majority of this court reverses this judgment of the court below, and sustains the classification of the material by the collector as scrap steel. I do not believe that conclusion of the majority is at all justified by the facts in the record or by the law applicable thereto. As briefly as I may, I shall state my reasons for this conviction.

It must be conceded by all that there is much ambiguity of language and uncertainty of meaning in the language of the various statutes here involved. In such cases, we may inspect the history of the legislation and use such other side lights as will enable us to read the said statutes more understandingly. *Tilge* v. *United States*, 2 Ct. Cust. Appls. 129; *Koch* v. *United States*, 6 Ct. Cust. Appls. 534; *United States* v. *Sickle*, 6 Ct. Cust. Appls. 146; *Stone & Downer* v. *United States*, 12 Ct. Cust. Appls. 62.

Beginning with the act of October 1, 1890, what is now paragraph 301 made its appearance and has continued with minor changes. Tungsten was first mentioned in the act of August 5, 1909, where, in paragraph 184, ferrotungsten and tungsten metal, according to value, were dutiable at 25 per centum or 20 per centum ad valorem, and where, by paragraph 190, tungsten bearing ores were dutiable at 10 per centum ad valorem. This was the first recognition by Congress of this newly discovered metallic element. Following this, the tariff act of October 3, 1913, introduced a new policy. Tungsten bearing ores of all kinds were admitted free of duty under paragraph 633, as well as scrap steel under paragraph 518. Ferrotungsten, tungsten metal and alloys used in the manufacture of steel, as well as alloys used as substitutes for steel in the manufacture of tools and steels containing alloys such as tungsten, were dutiable at 15 per centum ad valorem under paragraphs 102 and 110, respectively. This was the condition when the Tariff Act of 1922 was enacted.

That act made a radical change in the governmental policy as to the importation of tungsten. Tungsten ore, instead of being free as formerly, was made dutiable at 45 cents per pound, *on the metallic tungsten contained therein;* here, two purposes are apparent: First, to impose a high duty on the crude material, and, second, to impose the duty on the tungsten content, however small it might be.

Again, ferrotungsten, metallic tungsten, tungsten powder, tungstic acid, all other compounds of tungsten, and all other alloys of tungsten not specially provided for, were made by paragraph·302, dutiable at 60 cents per pound, *on the tungsten contained therein,* and 25 per centum ad valorem. This was in lieu of a former provision of 15 per centum ad valorem on ferrotungsten and tungsten metal alone. It will be observed that the Congress added the words "tungsten powder," "tungstic acid," "compounds of tungsten" and "alloys of tungsten," and the additional language *on the tungsten contained therein.* It seems apparent that the greatest care was being exercised not only to mention any substance which might contain tungsten, but also to reach any portion of tungsten, however small, which might be imported. Such great particularity must be given some meaning. It is plain that Congress was proposing to protect American producers of tungsten bearing ores .and metals. This may also be gathered from the reports of the congressional committees. The Committee on Ways and Means of the House, majority report, on H. R. 7456, which afterwards became the Tariff Act of 1922, said in part:

Third, articles the production of which was begun largely during the war period and which have not yet reached the stage of competition upon even terms with those longer engaged in the industries in foreign countries. A number of these may be truly called "infant" industries. Surgical and scientific instruments, scissors, and tinsel threads are examples of this type of industry, as well as the mining of the various ores of ferro-alloys and the metals used in alloying steel· The rates of duty proposed on this group are intended primarily to protect and encourage the development of these industries.

The Finance Committee of the Senate, on the same bill, also reported, in part, as follows:

The general policy of adjusting rates on raw materials to protect the domestic mining industries without inflicting undue harship upon the consuming interests was followed throughout the metals schedule. The rate on tungsten ore in the House bill was retained, but the specific rate on ferrotungsten was reduced to permit a differential allowance for the losses suffered by the manufacturer of high-speed steel, at the same time protecting the ferro-alloy manufacturer.

Such reports have always been held to be properly considered by courts in determining the intent of acts being construed. *United States* v. *Sickle, supra.*

It will also be borne in mind as a matter of current history that during the World War great efforts were made by our Government to encourage the production of tungsten and other similar metals and

to develop the mining of ores bearing the same.   An act was approved October 5, 1918, entitled "An act to provide further for the national security and defense by encouraging the production, conserving the supply, and controlling the distribution of those ores, metals, and minerals which have formerly been largely imported, or of which there is or may be an inadequate supply."   That act authorized the President, in section 2 thereof, to ascertain, fix and proclaim any rates of duties upon any of such mineral substances, including tungsten, as he might deem sufficient to protect their producers.   The powers therein given were to end with a proclamation of peace.   It is also a matter of common knowledge that at the close of the World War, further legislation was enacted by Congress with the intent to liquidate the losses, so far as possible, of those who had, during the stress of war, entered this field of production.   40 Stat. 1272; 42 Stat. 322.   It was at this time that the Tariff Act of 1922 was in formation and passed.   It is within reason to believe that the various provisions of that act, relative to these rare metals which had been the particular care of the Congress theretofore, were intended, so far as possible, to continue that governmental policy.

It is therefore most manifest that the Congress intended to fully protect domestic producers of tungsten, in any form.   The conclusion of the majority of this court is that it has not done so, and has failed as to certain forms of tungsten bearing metal to give such protection. It becomes necessary, in this connection, to examine the various paragraphs of the act which relate to this subject.

Schedule 3 of the Tariff Act of 1922, metals and manufactures of, contains all these paragraphs.   Paragraph 301 is a raw material paragraph referring to iron and spiegeleisen and including scrap steel as such a raw material.   Paragraph 302 includes the various forms of manganese, molybdenum, tungsten, chromium and other similar alloys, as raw material suitable for manufacturing purposes.   It is a comprehensive paragraph, and it is impossible to escape the conviction that it was the congressional intent to make it embrace every form in which tungsten might be imported, as a raw material, from the ore to complex mixtures and compounds.   Paragraph 303 provides for iron advanced beyond the pig-iron stage, but being still material for further manufacturing processes.   Paragraph 304 is essentially a steel paragraph and provides for certain manufactured forms therein enumerated which may or may not be material for other manufacturing operations.   Included in this paragraph is the provision for "alloys, not specially provided for, used as a substitute for steel in the manufacture of tools," relied upon to some extent by the protestant here.

Paragraph 305 provides for an additional duty on "steel in all forms and shapes" which has been alloyed with more than six-tenths

of 1 per centum of tungsten or the other rare metals named in the paragraph. We have said in *United States* v. *Downing*, 14 Ct. Cust. Appls. 194, T. D. 41702, that the language "Steel in all forms and shapes, by whatever process made, and by whatever name designated, whether cast, hot or cold rolled, forged, stamped or drawn," would seem to imply steel which had been subjected to manufacturing processes. Adopting this as the correct view, we come to the conclusion that paragraph 305 was intended to reach the proportion of tungsten or other rare mineral used to alloy a steel which had been manufactured into any form or shape.

Following this is paragraph 306, which defines steel as follows:

PAR. 306. All metal produced from iron or its ores, which is cast and malleable, of whatever description or form, without regard to the percentage of carbon contained therein, whether produced by cementation, or converted, cast, or made from iron or its ores, by the crucible, electric, Bessemer, Clapp-Griffith, pneumatic, Thomas-Gilchrist, basic, Siemens-Martin, or open-hearth process, or by the equivalent of either, or by a combination of two or more of the processes, or their equivalents, or by any fusion or other process which produces from iron or its ores a metal either granular or fibrous in structure, which is cast and malleable, excepting what is known as malleable-iron castings, shall be classed and denominated as steel.

Thereafter, in paragraphs 307 to 319 and in succeeding paragraphs, various forms of iron and steel manufactures are provided for.

From this comprehensive survey of the statute, we must inevitably come to the conclusion that the Congress provided a duty upon tungsten, in any form, as a raw material, in paragraph 302 and whenever tungsten had been used to alloy steel, manufactured, such tungsten content was to be ascertained and assessed with duty under paragraph 305. In this way the whole field was covered.

It is argued, however, by the importer that the material imported here, being scrap steel containing a percentage of tungsten content, is not specifically named in the enumeration of materials found in paragraph 302.

The court below found the material imported to be a compound of tungsten. In *Monticelli Bros.* v. *United States*, 8 Ct. Cust. Appls. 21, we said:

The citation of authorities is unnecessary to satisfy the mind that a compound or combination in the general understanding is necessarily something composed of more than one component material; the words themselves imply that requirement, because a compound or combination is a thing which results from the act of compounding or combining, and that obviously is the putting together or mixing in some manner of the materials requisite therefor.

To the same effect, reference is had to: *United States* v. *Stubbs*, 91 Fed. 608; *Lee Co.* v. *McClain*, 106 Fed. 164. In *United States* v. *Stone & Downer*, 175 Fed. 33, 37, it was held that the word compound, as used in paragraph 2 of Schedule A of the tariff act of

July 24, 1897, covered any "union or mixture of elements, ingredients or parts," and said further:

In view of the fact that, except as applicable to certain specific medical preparations where it has a special narrow use, the word "compound" has no particular commercial limitation, there is no reason why it should not be interpreted here in its broadest sense, according to its natural meaning as commonly understood. There is all the more reason for this because any limitation on the expression under discussion, wherever found in the customs statutes in connection with spirits, would open an opportunity for evading or avoiding the purpose of the revenue laws, both the internal revenue laws and the customs laws, contrary to the evident general intention to levy a high duty, at least for once, on all spirits whether of domestic or foreign production. Moreover, in no other way can the word "compound," when linked with "preparation," have any appreciable effect.

Following the rule announced in the cases cited, we should hold the imported material to be a compound of tungsten. In fact, this is conceded by the majority opinion, for it is there said:

This material is composed of more than one element. It contains at least three elements, iron, carbon, and tungsten. It is, therefore, in a general sense, a compound. But it does not result from the act of compounding or combining iron, carbon, and tungsten. The result of that combination was high speed steel, manufactured for a definite purpose and use. The high-speed steel was not intended or designed to have the uses of ferrotungsten, metallic tungsten, tungsten powder, or tungstic acid, but was intended, having the qualities which it possessed, to serve the purposes and uses of such steel. We do not think that it can be seriously contended that high-speed steel is either a compound or an alloy of tungsten for tariff purposes.

The majority opinion, therefore, proceeds upon the theory that the tungsten steel originally made was not intended to be used as a raw material, but to be used as steel, and that therefore it ought not to be considered as a compound. The record shows the material imported here was not intended to be and was not used as steel, but as a raw material to add a tungsten content to steel. Therefore, applying the theory advanced by the majority, it would follow that the material here imported was a compound of tungsten.

Again, it is said in the majority opinion:

Assuming, without deciding, that the involved material is not only scrap steel, fit only to be remanufactured and valued at less than 7 cents per pound, but that it is also a "compound of tungsten," or an "alloy used in the manufacture of steel," it can not for a moment be doubted that it is more specifically provided for under paragraph 301, which accurately describes the merchandise, as to name, character, value, and use.

Here is a plain statement that the rule of relative specificity should apply, even if the material imported be a compound of tungsten. In this view, we believe the court has fallen into error.

No one principle in the construction of tariff laws has been more definitely settled than this: If the congressional intent is plainly manifest from a reading of the statute, its context and, if necessary, other

statutes *in pari materia,* then that congressional intent shall prevail over all other rules of construction. It was said in *Roosevelt* v. *Maxwell,* 20 Fed. Cas. 1156:

The commercial understanding of the terms might be adopted, if it did not appear, by the act itself, that a different meaning was intended by the lawmakers. And if it does appear, by the act itself, that a particular meaning was intended by the terms used, then that particular meaning should be adopted in giving a construction to the act, whatever the commercial meaning of the terms may have been.

See also *Stone* v. *United States,* 2 Ct. Cust. Appls. 46; *Frank* v. *United States,* 5 Ct. Cust. Appls. 273; *United States* v. *Fisher,* 2 Cr. 358 (386); *United States* v. *White,* 2 Ct. Cust. Appls. 80; *United States* v. *Murphy & Co.,* 13 Ct. Cust. Appls. 456 (459).

The intent of the law is the law. Lewis' Sutherland Stat. Cons., sec. 363. The rule of relative specificity has no application if it be apparent that the Congress intended otherwise. Therefore, it follows that if we find the Congress here intended to impose duties upon all imported tungsten, in any form, and if the material imported is a compound of tungsten, then the congressional intent to make all tungsten dutiable prevails and the question of what might or might not be the relative specificity of the terms "compound of tungsten" or "scrap steel" has no application at all.

And can it be doubted that it was the congressional purpose to make all tungsten dutiable? Can anyone contend that the Congress purposely omitted one form of that product? The majority opinion holds that the imported material, because it is worth less than 7 cents per pound, must be classified as scrap steel. What would be its dutiable status if it was worth more than 7 cents per pound? It must be assumed that there may be iron and steel scrap, with tungsten alloy content, worth much more than 7 cents per pound. Following the opinion of the majority to its logical conclusion, such scrap would not be dutiable at all, at least upon its tungsten content. In other words, the Congress omitted to make dutiable tungsten used as an alloy in scrap steel, where the scrap was worth more than 7 cents per pound. It can not be argued that tungsten steel scrap worth less than 7 cents a pound is steel scrap and, if worth more than 7 cents a pound it would be a compound of tungsten. It is either a compound of tungsten or not, irrespective of what prospective purchasers may care to pay for it. We are not justified in reaching any such conclusion. The presumption must be that the Congress has covered the entire subject it attempted to legislate upon.

Having seen, therefore, that the material imported is a compound of tungsten, and as such specifically enumerated in paragraph 302, and that the rule of relative specificity does not apply, it follows that the court below did not err in directing it to be so classified.

There is another equally compelling reason for such a conclusion. Paragraph 306 defines steel as a "metal produced from iron or its ores * * * without regard to the percentage of carbon contained therein." This definition first appeared in the tariff act of July 24, 1897 (par. 139), and has continued, practically unchanged, since that time. Tariff act August 5, 1909, par. 139; tariff act October 3, 1913, par. 117. When it first appeared in the said act of 1897, tungsten had never been specifically enumerated in any tariff act, and did not appear in the act mentioned. Therefore, it can not be said that it was intended to include any metallic substance containing tungsten. What is there to induce the belief that the definition has since grown to include mixtures of steel and tungsten? No court has so decided, nor has any departmental practice sanctioned it. The definition is unequivocal and plain: The material must be produced from iron or its ores, with more or less carbon added. In the case at bar, part of the material before us is not produced from iron or its ores, but is produced from tungsten or its ores. The majority opinion quotes at length excerpts taken from various lexicographic authorities defining the word "steel," from which it is sought to be adduced that steel may contain tungsten and other alloys and yet be "steel." What justification is there for this court to go to such authorities for a definition of steel? The Congress has given us a definition in paragraph 306 and this definition is a clear mandate to us. When we depart from the guide the Congress has given us and substitute something else, we indulge in judicial legislation. Nothing can be more dangerous. The Congress defined steel to be a product of iron or iron ore, with a mixture of carbon. If the majority opinion is right and scrap steel may contain tungsten, it may also contain chromium or cobalt, or nickel, or varous other materials, and yet be steel, irrespective of the statutory definition. And if scrap steel may contain such other materials, so may any other manufactured steel named in the various paragraphs of the statute, and yet be steel.

If this be true, why does the statute define steel? If this construction be followed, where does the statutory definition of steel apply? To follow the majority opinion in this respect is to adjudicate the statutory definition of steel out of existence. We have no right to do this. Effect should be given to every part of the statute, where possible. *Wilson & Son* v. *United States*, 6 Ct. Cust. Appls. 255; *Sonneborn Sons* v. *United States*, 1 Ct. Cust. Appls. 443; *Lehn & Fink* v. *United States*, 12 Ct. Cust. Appls. 359. But the majority opinion proceeds upon the theory that it is inferable, from a reading of paragraphs 301 and 305, that it was not intended that the word "steel" should be restricted as defined in paragraph 306. Attention is called to the fact that in paragraph 305 the language is "steel in all forms and shapes * * * containing more than six-tenths of

1 per centum of * * * tungsten," and it is argued that such language is a recognition by the Congress that steel may contain tungsten, and yet be steel. That might be a fair inference if a contrary congressional intent were not plainly evident and if it were not for the following language, immediately succeeding that above quoted: "or any other metallic element used in *alloying* steel." (Italics ours.) If steel may contain tungsten, why speak of *alloying* steel with tungsten? The first proviso to the paragraph, it will also be noted, refers to manganese and silicon as *alloying material in the steel*, thus plainly differentiating the steel from its alloys. Again, the paragraph provides that "in addition to the rates of duty provided for *in this schedule on steel* in all forms and shapes," t ere shall be levied certain additional duties therein mentioned, when the tungsten content is more than six-tenths of 1 per centum. In order to assess duty under this paragraph, the steel must be assessed with its appropriate duty, according to its form, as specified in its proper paragraph of the metals schedule. After so doing, it is then subjected to the additional duties provided by paragraph 305 because of its tungsten content. Instead, therefore, of paragraph 305 indicating that steel is steel even though it contains alloying metals, I conclude that a fair reading of the paragraph leads to the belief that the Congress had constantly in mind the distinction between steel and *alloying mineral substances*.

It is also suggested that there is nothing in paragraph 301 that suggests the Congress intended to limit it to "ordinary carbon steel," and then states:

* * * it seems reasonable to suppose that had it been intended to limit the operation of paragraph 301, as far as the issues in this case are concerned, to ordinary carbon steel, it would have plainly so provided.

In other words, although the Congress, in paragraph 306, defined steel as produced from carbon and iron, and in 301, referred to "scrap steel," nevertheless, "scrap steel" in said paragraph 301 must be held to include steel alloyed with tungsten, unless a contrary intention is expressed. Such a construction is violative of the cardinal rule of statutory construction that the language of the statute must be given its ordinary meaning, unless there is a manifest legislative intent to depart from it. I can find no such intent here.

In support of the theory advanced by the majority, certain language used in a publication issued by the Carnegie Steel Co. is quoted to the general effect that other elements besides iron and carbon, notably manganese, are usually present in commercial steel. Based upon this authority, it is deduced that there would thus be little steel or iron to be classified as scrap steel or iron under paragraph 301, if iron or steel containing tungsten was excluded. Therefore, it is said, this demonstrates that the Congress intended to include steel with a

tungsten alloy within the scope of the term "scrap steel" in paragraph 601. In other words, dismissing the definition of steel given by the statute, and basing the conclusion entirely upon a trade publication, the court reaches its conclusion that "steel scrap" means steel scrap bearing any quantity of tungsten or chromium, so long as the value of the scrap does not exceed 7 cents a pound.

In further support of the proposition that the Congress intended the word "steel" to include steel alloyed with tungsten or other rare metals, it is said in the opinion:

Furthermore, it will be observed that the metal schedule, beginning with paragraph 307 and extending to and including paragraph 400, contains a large number of provisions for a great variety of manufactured products. Of these, 41 paragraphs relate to articles made wholly or partly of steel. If it should be held that the Congress intended to limit steel and the scrap thereof to such as was composed of iron and carbon only, it would follow that, if any of the steel articles provided for in paragraphs 307 to 400, inclusive, were made of steel which contained any element other than iron and carbon, such article, although obviously intended to be provided for therein, would be excluded therefrom— which is a reductio ad absurdum.

This is, in effect, a holding by the court that all products manufactured of steel, named in paragraphs 307 to 400, inclusive, are dutiable only at the rates expressly provided in the respective paragraphs for each, although such manufactured products may contain tungsten, nickel, cobalt, vanadium, chromium, molybdenum, or any other metallic element used in alloying steel.

An examination of these paragraphs may therefore be useful. The following articles are made dutiable by the paragraphs named: Steel boiler plate (307), common or black steel sheets (308), steel sheets, plates, bars, and rods (309), steel, tin or lead plated (310), steel beams, girders, joists, etc. (312), hoop, band, and scroll steel (313), steel wire rods (315), steel wire (316), steel anchors and forgings (319), railway fishplates, tie plates, etc. (322), axle bars, blanks, etc. (323), steel blacksmith's hammers, wedges, etc. (326), steel pipes, tubes, etc. (328), steel chains (329), steel bolts, nuts, and washers (330), steel cut nails (331), steel wool and shavings (334), cut steel grit, shot, and sand (335), and so on to the end of the metals schedule. The court is now stating, by inference, that each and all of these manufactured products may contain tungsten or any of the other rare metals which the Congress has so zealously sought to protect, and yet this tungsten or other alloying material shall pay no additional duty under paragraph 305 or under any of the other paragraphs from 302 to 304, inclusive. To illustrate the effects of this holding, let us have in mind two importations of hoop, band, or scroll steel under paragraph 313, one of plain carbon steel, and one containing a considerable element of tungsten. According to the opinion of the majority, both are dutiable at the same rate at from

twenty-five to fifty-five one-hundredths of a cent per pound. Such instances might be multiplied almost indefinitely. The effect of such a holding is to exempt practically every manufacture of steel, at least all those enumerated in paragraphs 307 to 400, inclusive, to which has been added tungsten or any other alloy from the additional duty provided in paragraph 305 and to permit tungsten and the other alloy metals to flow freely and at trivial duties into the commerce of the country. All that would be necessary would be to incorporate them, to any desired degree, into any of the manufactured products named in paragraphs 307 to 400, inclusive. I am certain such a conclusion is not warranted and results in an unfortunate perversion of the manifest intent of the statute.

The conclusion of the majority in this particular is not based upon any administrative practice or any adjudged cases—at least, none are cited. Nor, in my way of thinking, is it a reasonable conclusion. Wherever, in paragraphs 307 to 400, inclusive, articles are included, which, from their nature, might ordinarily contain tungsten or other alloys, the Congress was careful to omit the qualifying adjective "steel." Observe, for instance, the following examples: Woven wire gauze and screen (318), ball bearings (321), jewelers' anvils (325), lathed and machined rivets and studs (332), corset clasps (336), saws (340), umbrellas and parasols, *composed wholly or in chief value* of steel (342), needles (343), fishhooks (344), saddlery and harness hardware composed of steel, *composition*, or other metal (345), knives (354, 355, 356), scissors (357), razors (358), surgical instruments (359), files (362), guns (365), and many other like examples. In view of these facts, so apparent upon the face of the statute, it is hard to understand upon what theory the court holds that the various products named in paragraphs 307 to 400, inclusive, may contain tungsten or other alloys and not be dutiable thereon. But this is the conclusion, for the majority opinion states:

If it could be fairly argued that the Congress intended, by its definitions of steel, to exclude for tariff purposes all such steel as contained an *appreciable* amount of any alloying material the contention might be worthy of serious consideration. But it is obvious that such a construction of the statute is not warranted by anything contained therein. And so we are confronted with the alternative of holding that the statutory definition of steel covers all steel, except such as is expressly excluded, or only such as contains nothing but iron and carbon. Having demonstrated the absurdity of the second alternative, we must rest upon the first.

In other words, although paragraph 306 defines steel as a metal produced from iron or its ores, without regard to the percentage of carbon, under this judicial construction, steel means carbon steel alloyed with tungsten or other alloys, wherever the word steel is used in the statute, unless the statute expressly directs to the contrary.

Thus, by an argument based upon an erroneous assumption, a conclusion is arrived at in direct conflict with the statute.

If the court is right in its conclusions, what is left to which we can apply the additional duty provided for in paragraph 305? If this additional duty does not apply to the steel manufactured products enumerated in paragraphs 307 to 400, inclusive, what does the language "steel in all forms and shapes" as it appears in paragraph 305 refer to, for, as we have seen, almost every manufactured form and shape of steel of which the imagination of man can conceive, is enumerated in paragraphs 307 to 400, inclusive?

All these difficulties and embarrassments resulting from such a conclusion are avoided by following the plain and unambiguous language of the statute. Whenever and wherever steel as a material or manufactures of steel are made dutiable, without reservations, then the statutory definition should be applied. Where tungsten or other alloys have been added above the six-tenths of 1 per centum named in paragraph 305, then this tungsten or other alloy content should be subjected to the additional duty provided by the statute. By so doing we would avoid *obiter dictum*, would not attempt, unnecessarily, to pass upon the classification of hundreds of articles named in paragraphs 307 to 400, inclusive, and would come to a conclusion in harmony with the purpose of the law.

That I may not be misunderstood, let me reiterate. The definition of steel given in paragraph 306 is intended to operate on the dutiable status of an article in a quantitative way, and not to fix its dutiable *situs*. If an imported product said to be of steel is to have the benefit of the various rates fixed in the metals schedule for a steel product of that character, it must be carbon steel; if it contains tungsten above six-tenths of 1 per centum, it must pay not only the appropriate duty for steel but also the additional duty provided in paragraph 305. To illustrate, reference is had to railway bars made of steel, named in paragraph 322. If railway bars are imported, which, by material of chief value, commercial designation, or some other proper method of proof, were known as steel railway bars, but which also had a tungsten content of over six-tenths of 1 per centum, the presence of such tungsten content would not remove the articles from said paragraph, but it would operate to subject the articles to not only the rate of duty provided in the paragraph, but also the duty provided for the tungsten content in paragraph 305. The object of the statutory definition of steel was not to fix the classification of dutiable articles, but to extend certain particular rates to carbon steel products.

But little more need be said. If the imported material is a compound of tungsten, it is specifically named and dutiable under paragraph 302, as found by the court below. As to the further finding

below that the material is properly subject to the additional duties provided in paragraph 305, I find myself in disagreement with the court below. As we have seen, the first section of said paragraph 305 refers to "steel in all forms and shapes," importing a process of manufacture. I am not prepared to hold that the imported material comes within that classification. The latter section of the paragraph provides an additional duty upon the steel and alloys enumerated in paragraph 304, none of which, I believe, include the imported material. I would therefore conclude that the material imported is dutiable at 60 cents per pound on the tungsten contained therein and 25 per centum ad valorem, as provided in paragraph 302.

It is argued that if the duties named in paragraph 302 were imposed upon the material imported here, such duties would be prohibitive and that such a construction ought not to be adopted and counsel cite in support thereof *United States* v. *Vietor*, 1 Ct. Cust. Appls. 297, and *United States* v. *Proctor*, 145 Fed. 126, 130. In both cases cited, the courts held that, in the absence of a plain legislative intent otherwise, they would not adopt holdings which had the practical effect of prohibiting importation. But here there is a plain legislative intent, if not to prohibit, to place great restrictions upon importation. The evidence shows the material imported here is used, as imported, without change. Can the importer argue that with such material already processed and ready for use, he should have more favorable treatment than the importer of raw, crude ore, who must, under paragraph 302, pay a duty of 45 cents per pound upon the metallic tungsten content thereof, and must, in addition, subject his ore to most costly and involved processes before it is ready for use? The conclusion of the majority leads to the same end. Computing the tungsten content of the imported material at 14 per centum, there were 280 pounds of tungsten to the ton. If this tungsten had been imported in the crude ore, it would have paid duty under paragraph 302 at 45 cents per pound or a total duty per ton of $126; under the conclusion of the majority, it will pay 75 cents per ton. Certainly, we should come to no such conclusion unless forced to do so by the language the Congress employed. It is the duty of this court to give to every part of this statute a reasonable construction so that its several parts will each be operative and consistent, if this be possible. It is settled law that a statute should receive a sensible construction, one that is in harmony with the purposes of its enactment and will, if possible, avoid an unjust and absurd conclusion. *Heide* v. *United States*, 2 Ct. Cust. Appls. 399.

Many other questions are raised by protestant, but in view of my conclusions as above expressed, it is not necessary to discuss them here.

I do not believe, by a strict and technical construction, we should so construe this statute as to defeat its purpose. Knowing, as we must, the plain intent of the Congress, and being justified by the language it employed, the court should not hesitate in giving to the statute such a construction as will make of it, as was intended, a complete, harmonious, and properly graduated law to carry out the purposes for which it was enacted.

In my judgment, the judgment of the court below should be modified as herein indicated and the cause remanded for that purpose.

### DISSENTING OPINION

Bland, Judge: The manifest intention of Congress to afford adequate protection for all kinds of tungsten and tungsten material is so strongly indicated by the manner in which the subject is treated at so much length, and with such care, in the steel schedule, that, in my judgment, it should not be ignored unless no other reasonable interpretation of the language used can be indulged.

The incongruous result arrived at by the majority opinion, which places a duty of 75 cents per ton upon imported material, which, according to the declared purpose of Congress, should bear not far from 200 times that amount of duty, should prompt a most diligent and zealous search into the legislation and its legislative history in order to find an interpretation of the language used, if possible, which would bring about a result consistent with the unquestioned and undisputed legislative policy.

The reasoning of the ruling opinion, in my judgment, concedes that the importation is a compound of tungsten, but denies its classification as such on account of the force given to the rule of interpretation known as relative specificity.

Such a rule of interpretation is applied by the courts for the purpose only of determining the intention of the legislature, and no rule of interpretation can stand against other evidences of intention more persuasive. If this material is a compound of tungsten, and is used as such, hair-splitting technicalities and subtle judicial refinements should not prevail with such disastrous results against an interpretation admittedly more in harmony with the general scope of the legislation, when such interpretation is abundantly sanctioned by the highest recognized authorities.

In most of the views expressed by Presiding Judge Graham, in his dissenting opinion, I most heartily concur. I disagree with his views as to paragraph 306, which defines steel. Also, it seems to me that the majority opinion, as well as Judge Graham's opinion, overlooks one of the most important considerations involved.

A most impelling reason why the importation at hand should not be assessed for duty under paragraph 301 as scrap steel valued at

not more than 7 cents per pound, at 75 cents per ton, is on account of the last proviso used in the paragraph, which is as follows:

*Provided further,* That nothing shall be deemed scrap iron, or scrap steel except secondhand or waste or refuse iron or steel *fit only to be remanufactured.* (Last italics mine.)

I think Congress had in mind in providing for "scrap steel  *  *  * fit only to be remanufactured" such scrap steel as was to be remelted to make a new product—steel, which, when remelted, would possess substantially the same characteristics that it possessed before remanufacture. Congress did not intend to include within the paragraph a scrap that was not only fit to be remanufactured back into tool steel possessing substantially 14 per centum of tungsten, but which was also fit to be used as ferrotungsten is used, in giving a tungsten content to a charge. *Alloying steel is not a remanufacture of the alloying material.*

The board found, and the ruling opinion of this court approves the finding, that the importation was fit only to be remanufactured. Witnesses testified that it was fit only for remanufacture. In so testifying, in my judgment, they were giving their opinions of what amounts to a question of law and which was erroneously decided by the board and by this court. The importation is *not* "fit only to be remanufactured." It is, in its imported condition, *fit to be used as an alloy in a molten charge of steel,* and the proof in the case unquestionably establishes that its chief use, if not almost its entire use is a use similar to that of the alloys of tungsten so carefully enumerated in paragraph 302, upon which a high ad valorem duty was placed.

Scrap rubber "fit only to be remanufactured" is rubber that is melted together and again made into rubber. Scrap lead "fit only to be remanufactured" would be scraps of lead which would be again melted together to make the material lead or articles of lead. Ferrotungsten may be a manufacture from tungsten ore, or a manufactured product. When ferrotungsten is inserted in the charge to give a tungsten content could it be said that it is "remanufactured" within the meaning of the paragraph under discussion? I think not, and for the same reason I do not believe that when Congress provided for scrap "fit only to be remanufactured" it intended to include a scrap which was used as a substitute for ferrotungsten.

Paragraph 306 is found in the metal schedule and defines steel as "all metal produced from iron or its ores." Judge Graham arrives at the conclusion that steel is not steel if it contains any alloy, but must be the product of iron or its ores only. To my way of thinking, this paragraph gives an *inclusive* definition and not an *exclusive* one. In other words, all is to be classified and denominated as steel if it comes from iron or its ores, but if it should contain, also, an

alloy, it is not to be excluded from the paragraph for that reason. It seems to me that the different producing processes set out in paragraph 306 would indicate that steel containing alloy is included and not excluded from "steel" as defined in the paragraph.

It is my opinion that the scrap material under consideration in this case may be "steel" but it is not the "scrap steel" provided for in paragraph 301. It is not "steel in all forms and shapes," referred to in paragraph 305. *United States* v. *Downing & Co. (Inc.)*, 14 Ct. Cust. Appls. 194, T. D. 41702. It should be classified as dutiable under paragraph 302.

. For these and other reasons I am compelled to dissent from the opinion of the court.